**NEW ENGLAND TELEPHONE &
TELEGRAPH CO.**

v.

**PUBLIC UTILITIES COMMISSION
et al.**

Supreme Judicial Court of Maine.

Argued Nov. 17, 1981.

Decided July 6, 1982.

Pierce Atwood, Scribner, Allen, Smith & Lancaster, Ralph I. Lancaster, Jr. (orally), Everett P. Ingalls, Portland, John F. Natoli, Morrison DeS. Webb, Boston, Mass., for plaintiff.

Joseph G. Donahue (orally), Charles F. Dingman, Horace S. Libby, Cushing W. Pagon, Kimball L. Kenway, Augusta, for P. U. C.

Smith, Loyd & King, Angus S. King, Jr. (orally), Brunswick, for Casco Bank & Trust Co.

Smith, Stein & Bernotavica, Gordon E. Stein (orally), Jeffrey A. Smith, Hallowell, Thomas J. Connolly, Intern, for Common Cause.

Before GODFREY, NICHOLS, ROBERTS, CARTER, VIOLETTE and WATHEN, JJ.

GODFREY, Justice.

On July 1, 1980, New England Telephone & Telegraph Company (NET), pursuant to 35 M.R.S.A. § 64 (Supp.1981–82), filed with the Public Utilities Commission (hereinafter the "PUC" or the "Commission") revised tariffs to become effective July 31, 1980, seeking a $39.5 million increase in its annual gross revenues. The effective date of the tariffs was suspended twice per orders of the Commission dated July 22 and October 24, 1980. After filing,[1] notices of NET's proposed rates were published in various newspapers providing that all petitions to intervene must be filed by July 28, 1980. Petitions were filed by Casco Bank & Trust Co., the United States Department of Defense, the Telephone Answering Association of New England and twenty-two individual answering service companies, Common Cause, the Maine Committee for Utility Rate Reform, and Peter M. Beckerman, Esq., who sought limited intervention on the issue of directory assistance charges. On October 16, 1980, the Commission granted party status to all petitioners.

The Commission subsequently granted NET's motion to place the burden of proof on intervenor Beckerman regarding the directory assistance charge issues, and later the Maine Committee for Utility Rate Reform withdrew as a party prior to the commencement of the hearings. After the hearings began, the Maine State Department of Finance and Administration petitioned the Commission to permit it to participate in the proceedings as a public witness under Commission Rule 6(c)(2) by presenting an expert on its behalf.

Procedural Order No. 1 issued on August 5, 1980 established that the alternative pro-

1. NET also filed proposed rate increases for its Apartment Door Answering Service, (Docket No. 80–241), on November 13, 1980, and for certain of its PBX services, (Docket No. 80–252), on November 18, 1980. The effective dates of these tariffs were suspended by the Commission, and the cases were consolidated with the principal rate case, (Docket No. 80–142). Both cases were, however, subsequently severed from Docket No. 80–142 by the March 30, 1981 Decision and Order for further investigation. Consequently, they are not directly implicated in this appeal.

cedure prescribed by Commission Rule 6(I) would be followed. According to Rule 6(I), the presiding officer may require that an alternate hearing procedure be followed whereby prefiled direct testimony and exhibits are employed as a time-saving device. A somewhat compressed hearing schedule was promulgated by the Commission in Procedural Order No. 2, issued on November 17, 1980. This schedule established the various dates on which data requests, prefiled testimony, exhibits, and briefs were due. It also established the dates on which the hearing and the presentation of evidence was to occur.

After extensive prehearing discovery, actual hearings commenced on December 15, 1980, recessed for the holidays on December 22, and did not reconvene until January 12, 1981. The hearings concluded finally on January 30, 1981, after having consumed approximately sixteen working days.

During the hearings, some thirty-three witnesses were presented by the parties. At the close of the hearings on January 30, NET moved orally that the Commission not be permitted to consult ex parte with the hearing examiners,[2] arguing that such consultations violate due process of law. The Commission denied this motion on February 12, 1981 (Commissioner Smith dissenting). After the filing of briefs, the examiners issued their report on March 16, 1981. The parties had until March 22, 1981 to file exceptions, and on March 30, 1981, the Commission issued its Decision and Order (Commissioner Smith dissenting in part).

The Commission denied NET's proposed $39.5 million rate increase. Instead, it authorized NET to file a revised schedule of rates designed to increase revenues by $8.45 million; NET's revised tariffs were approved in a Supplemental Order dated April 16, 1981. On April 9, 1981, NET filed a petition to reopen the hearing, which was granted by the Commission on April 29, 1980. In its May 22, 1981 Decision and Order on Reopening, the Commission autho-

rized NET to file a revised schedule of rates designed to generate an additional $4.8 million in revenue. NET's revised schedule was approved by a Supplemental Order on Reopening dated May 29, 1981. The Commission thus authorized a total revenue increase of $13.25 million, approximately $26 million less than the original increase sought by NET.

On April 30, 1981, NET filed a complaint with the Law Court, pursuant to 35 M.R.S.A. § 305 (1978), seeking review of the March 30, 1981 Decision and Order. On June 2, 1981, NET filed a notice of appeal with the Commission, pursuant to 35 M.R.S.A. § 303 (1978), that it was appealing the March 30, 1981 Decision and Order, the April 16, 1981 Supplemental Order, the May 22, 1981 Decision and Order on Reopening, and the May 29, 1981 Supplemental Order on Reopening. By order of July 8, 1981, the senior justice of the Supreme Judicial Court consolidated for oral argument NET's section 305 complaint with its section 303 appeal.

NET challenges the Commission's decision in a number of respects. It raises procedural, evidentiary and substantive questions of law and fact. We sustain the Commission's order in most respects but vacate it in certain particulars.

## I. STANDARD OF REVIEW

Under 35 M.R.S.A. §§ 69 & 307, a public utility has the burden of proving that its proposed rate changes are just and reasonable. On appeal, the burden remains on the utility to demonstrate that the Commission has committed legal error. *Central Maine Power Co. v. Public Util. Comm'n*, 156 Me. 295, 299, 163 A.2d 762, 765 (1960). Two basic tenets of appellate review of ratemaking proceedings are (1) that the Commission, not the Court, is the judge of the facts and (2) that the Commission's findings of fact are final when supported by substantial evidence in the record. *Central Maine Power Co. v. Public Util.*

---

**2.** Among the hearing examiners was the late Horace S. Libby, Esq., general counsel to the

*Commission.*

*Comm'n*, Me., 414 A.2d 1217, 1232 (1980). The Court's review is limited to questions of law. "Only when the Commission abuses the discretion entrusted to it, or fails to follow the mandate of the legislature, or to be bound by the prohibitions of the constitution, can this court intervene." *New England Tel. & Tel. Co. v. Public Util. Comm'n*, 148 Me. 374, 377, 94 A.2d 801, 803 (1953). Traditionally, the Court's review is further limited by the institutional deference it pays to the Commission. The Court defers to the Commission's expert judgment in choosing among various ratemaking techniques or methodologies. *See, e.g., Mechanic Falls Water Co. v. Public Util. Comm'n*, Me., 381 A.2d 1080 (1978); *Central Maine Power Co. v. Public Util. Comm'n*, 153 Me. 228, 136 A.2d 726 (1957). Because of this limited and deferential standard of review, the Court is usually reluctant to substitute its judgment for that of the Commission. *See Central Maine Power Co. v. Public Util. Comm'n*, Me., 405 A.2d 153, 182 (1979).

NET's first contention on appeal is that the Court should abandon its traditional deferential standard of review and strictly scrutinize the Commission's action because of the numerous errors of procedure and judgment that NET asserts were committed throughout the proceedings. Several of NET's claims of error raise issues of constitutional due process.

1. *The Order.* NET argues that the order is not the product of the Commission's independent consideration and deliberation but the predetermined product of the hearing examiners. According to NET, the short interval between the deadline for filing exceptions to the examiners' report (March 22, 1981) and the release of the order (March 30, 1981) demonstrates the physical impossibility of adequate independent review. That the order is a reiteration, nearly verbatim, of the examiners' report is further evidence of the lack of independent consideration, NET asserts.

In reviewing administrative actions we have recognized and applied the principle that reviewing courts should presume, in the absence of clear evidence to the contrary, that administrative agencies have properly discharged their official duties.[3] *State v. Boyajian*, Me., 344 A.2d 410, 414 (1975); *In re General Marine Construction Co.*, Me., 272 A.2d 353 (1971). Here, NET asks us to infer from the short time—eight or nine days—in which the Commission considered the examiners' report and from the fact that the order substantially incorporated the report, that the Commission did not independently appraise the evidence and make the decisions. In effect, we are asked to hold that there is clear evidence that the Commission did not properly discharge its duties in reviewing NET's rates.

It is generally true that officials charged by statute with the duty of making a decision must consider and appraise the evidence on which their decision is based. *Morgan v. United States*, 298 U.S. 468, 481, 56 S.Ct. 906, 911, 80 L.Ed. 1288 (1936). But due process does not require that they hear or read all the testimony, and they may be properly aided by reports of subordinates. *Id.* In fact, 35 M.R.S.A. § 299 (1978), by specifically providing for the use of hearing examiners, contemplates that the Commission will be aided by their reports. Hence, even apart from the presumption of regularity that we accord to the proceedings of the Commission, the record in this case does not support a finding of a failure of due process attributable to the quickness of the Commission's decision and the resemblance of that decision to the examiners' findings. The record reveals no misuse by the Commission of the examiners' report, nor can we infer from the relatively short time the Commission had to consider the examiners' report that improprieties were committed.

2. *Horace S. Libby's Participation.* NET argues that it was error for the late Horace S. Libby, general counsel to the Commission and a staff advocate in past

---

**3.** The classic statement of the presumption appears in *United States v. Chemical Foundation*, 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926). The presumption is applied in most jurisdictions. 3 K. Davis, *Administrative Law* § 17.6 (2d ed. 1980).

NET rate hearings, to act as a hearing examiner in this case. It contends that he was irrevocably biased against NET on many of the issues before the Commission. According to NET, the examiners' report adopted many staff recommendations that Libby had advocated against NET in past rate proceedings.

■ The Maine Administrative Procedure Act (M.A.P.A.) expressly provides that an agency staff member may act as a presiding officer in any hearing. 5 M.R.S.A. § 9062 (1979). Although both due process and the M.A.P.A. require that hearings be conducted in an impartial manner, *see* 5 M.R.S.A. § 9063 (1979); *Gashgai v. Board of Registration in Medicine*, Me., 390 A.2d 1080 (1978), there is no evidence in the record of any specific instance of partiality or prejudgment on Libby's part. A preconceived position on law, policy or legislative facts is not a ground for disqualification. *See FTC v. Cement Institute*, 333 U.S. 683, 700–703, 68 S.Ct. 793, 803–804, 92 L.Ed. 1010 (1948). The federal cases that have found an agency officer disqualified have done so only after a showing of prejudgment on the specific facts subsequently presented to the agency. *See, e.g., Cinderella Career & Finishing Schools, Inc. v. FTC*, 425 F.2d 583 (D.C.Cir.1970); *American Cyanamid Co. v. FTC*, 363 F.2d 757 (6th Cir. 1966). The fact that Libby formerly acted as an advocate against NET cannot alone be the basis for a finding of bias.

■ In this case, NET has presented no persuasive evidence that Libby had prejudged any issues against it. NET simply argues that the fact that the examiners' report adopts many of the positions presented by Libby in his earlier role as a staff advocate is *per se* evidence of his bias and prejudgment. Following the guidelines established by the federal decisions, we find that evidence insufficient to establish bias and prejudgment on Libby's part.

■ A correlative argument made by NET is that the examiners—especially Libby—should not have been permitted to engage in ex parte communications with the Commission. That argument fails also. In general, section 9055 of Title 5 prohibits ex parte communications between agency members or hearing officers and any party or other person legally interested in the outcome of the proceeding.[4] *See, e.g., Berry v. Public Util. Comm'n*, Me., 394 A.2d 790, 793 (1978) (condemning certain ex parte communications between a Commissioner and a staff advocate as inconsistent with their respective roles as judge and advocate). But section 9055(2)(A) excludes from this prohibition communications between any agency member or hearing officer and other agency members or hearing officers. Thus, ex parte communications between hearing examiners and Commissioners in this case did not violate the Maine Administrative Procedure Act. Nor did those communications violate basic principles of fairness and due process of law. *See Morgan v. United States*, 298 U.S. at 481–82, 56 S.Ct. at 911–912, and *United States v. Morgan*, 313 U.S. 409, 422, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941). *See also* 3 K. Davis, *supra* at § 17.8.

4. 5 M.R.S.A. § 9055 (Supp.1981–82) provides as follows:

§ 9055. Ex parte communications; separation of functions

1. Communication prohibited. In any adjudicatory proceeding, no agency members authorized to take final action or presiding officers designated by the agency to make findings of fact and conclusions of law shall communicate directly or indirectly in connection with any issue of fact, law or procedure, with any party or other persons legally interested in the outcome of the proceeding, except upon notice and opportunity for all parties to participate.

2. Communication permitted. This section shall not prohibit any agency member or other presiding officer described in subsection 1 from:

A. Communicating in any respect with other members of the agency or other presiding officers; or

B. Having the aid or advice of those members of his own agency staff, counsel or consultants retained by the agency who have not participated and will not participate in the adjudicatory proceeding in an advocate capacity.

■ 3. *Burden of Proof.* In further support of its argument that the Court should scrutinize the proceedings strictly, NET contends that the Commission applied an erroneous standard for measuring NET's burden of proof. In particular, NET points to the burden of proof required for an attrition allowance. The examiners' report erroneously stated that NET must show by clear and convincing evidence that an attrition adjustment was warranted. However, the Commission's order, which adopts the examiners' report in most respects, contains no reference to any requirement of clear and convincing evidence as the requisite standard of proof. Instead, the Commission merely found that NET had failed to meet its burden of proving the justness and reasonableness of its attrition adjustment. From the Commission order, it does not appear that the Commission itself erred by applying a wrong standard of proof. In proceedings before the Commission, NET has by statute the burden of proving that its proposed rates are just and reasonable, 35 M.R.S.A. §§ 69 & 307, and nothing in the order indicates that the Commission disregarded or exaggerated that requirement. This Court cannot infer that the Commission itself did not consider and appraise the evidence using the correct standard of proof.

■ NET argues also that the Commission flouted what NET refers to as a "presumption of management prudence," *see Central Maine Power Co. v. Public Util. Comm'n,* 405 A.2d at 177, and did not justify its order except by stating that NET failed to prove the justness and reasonableness of its revenue increase. Again the record does not support NET's allegation. Regardless of any "presumption of management prudence," NET must still satisfactorily show that its proposed rates are just and reasonable. The Commission required no more, and it described adequately its reasons for rejecting NET's proposals.

In sum, we find no procedural or administrative improprieties that would justify the abandonment of our traditional deferential standard of administrative review.

## II. DUE PROCESS

Apart from the issue of the appropriate standard of review, NET argues that it was denied a fair hearing in violation of due process of law. NET presents selected instances that it claims evidence bias and lack of civility on the part of the hearing examiners. In addition to the claims described in Part I of this opinion, NET cites the incidents described below in support of its assertion that it was denied a fair hearing. Although due process safeguards extend to public utility rate hearings since a possible deprivation of the utility's property is in issue, *see Mechanic Falls Water Co. v. Public Util. Comm'n,* Me., 381 A.2d 1080, 1103 (1977), a thorough review of the proceedings, less focused on isolated instances, leads to the conclusion that NET was provided a fair hearing comporting with due process.

1. *The Schedule.* NET argues that the schedule announced by the Commission on November 17 deprived it of due process. It claims that the schedule prejudiced NET's ability to respond to data requests, to present its witnesses, to analyze and cross-examine the evidence of the Commission and the intervenors, to present rebuttal testimony, and to cross-examine surrebuttal testimony.

■ Although the schedule was compressed and allowed *all* parties less time to prepare than they might otherwise have had, that fact alone does not establish that NET was denied a fair hearing. Resolution of the issue whether the Commission's procedures comported with due process requires an analysis of the governmental and private interests affected. *Matthews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). A NET rate hearing is a long, complex proceeding, and the Commission is limited by statute to a maximum rate suspension period of nine months in which to determine the reasonableness of the tariffs proposed by the utility. 35 M.R.S.A. § 69 (Supp.1981–82). Because of limited resources and the many other regulated utilities with which it must be concerned,

the Commission cannot always announce a schedule and begin a rate hearing immediately upon the utility's filing of tariffs.[5]

 The four-and-one-half-months delay from NET's filing of its tariffs and the Commission's announcement of the schedule cannot be held to be "undue delay" in violation of either due process or the Administrative Procedure Act. Section 9056(1) of Title 5 requires an administrative agency to afford an "opportunity for hearing in an adjudicatory proceeding . . . without undue delay." After balancing NET's asserted interest in having the Commission address its rate proposals promptly so that the limited time could be used effectively for addressing the issues, with the legitimate governmental interest in managing fairly all pending proceedings within the limits of the Commission's resources, we find that the proceedings were begun without such undue delay as would amount to a violation of due process.

NET recounts several instances where the time constraints caused by the alleged undue delay in setting the schedule purportedly resulted in the placing of onerous burdens on NET and in the hearing examiners' making unfair rulings against NET. Although NET's claims and references to the record seem to indicate on their face possible procedural unfairness, a reading of the transcript in its entirety reveals that, on the whole, the examiners were fair and provided all parties an adequate opportunity to be heard.

 2. *Data Requests and Smith's Testimony.* NET makes several specific objections with respect to certain data requests and the testimony of Caroline Smith, a staff witness who testified on NET's cost of capital.

First, NET claims that it was forced to cross-examine staff witnesses without responsive answers to its data requests. In its first data request, NET sought expert-witness information, such as direct testimony, transcripts and workpapers of Commis-

sion witnesses in prior cases. Admitting that its performance in responding to NET's data requests was less than ideal, the Commission argues that NET, though inconvenienced, was not prejudiced by the staff's incomplete compliance and the examiners' partial denial of NET's motion to compel. Also, the Commission asserts that many of NET's data requests were unclear and burdensome.

From a review of the record, it is evident that the responses by the staff and the examiners to NET's requests were not as timely and complete as they might have been. However, there is no evidence of harm to NET resulting from the delay or incompleteness of responses by the staff or the examiners.

Second, NET argues that it was denied a fair hearing as a result of Smith's failure to respond comprehensively to its data requests for workpapers and the examiners' failure to grant a motion to compel. NET further asserts that the examiners erroneously permitted Smith to replace, revise and supplement her testimony repeatedly. The Commission admits that Smith did not respond comprehensively to all of NET's data requests, but it claims that such unresponsiveness was in part accidental.

NET's claim with respect to Smith's revision and supplementation of her testimony appears to disregard Commission Rule of Practice and Procedure 6(I)(2)(e), which permits a witness to supplement and explain his prefiled testimony either orally or in writing. In her supplemental testimony, Smith corrected errors, some of which were substantive, that she had made in her original report on NET's capital structure. NET was given ample opportunity to cross-examine Smith on the changes. Moreover, the fact that she made errors in her original report goes to weight and credibility, not to the propriety of receiving the supplemental testimony.

However, NET's claim that it was prejudiced by Smith's failure to submit her work-

---

5. For example, at the time NET filed its proposed tariffs, the Commission was in the midst of a CMP rate hearing that was not decided until October, 1980.

papers in response to its data requests has some merit. Apparently because of a misunderstanding and a transportation mischance, Smith's workpapers were not given to NET until a few hours before her scheduled cross-examination. That delay could have been prejudicial, since complex capital-structure formulas cannot be distilled in a few hours. But although prejudice could have resulted, it appears not to have materialized, for the hearing examiner offered to permit Smith to be recalled for further cross-examination at a later date—an invitation declined by NET.

■ 3. *Work Product.* NET claims that the examiners erred in denying NET's motion to compel production of a letter from a member of the Commission staff to one of its witnesses. The Commission argues that the examiners correctly denied the motion, since the letter contained trial preparation material for which NET did not show a substantial need. In general, the Maine Rules of Civil Procedure govern proceedings before the Commission. *See* Commission Rule of Practice and Procedure 2(A). M.R.Civ.P. 26(b)(3) provides that material prepared in anticipation of trial shall be discoverable only upon a showing of substantial need. NET argues that the letter was not trial preparation material because the staff had characterized it as "a guide to the issues." After examining the letter in camera, this Court finds that, regardless of how the staff may have characterized it, the letter was plainly trial preparation material, non-discoverable under Rule 26(b)(3) without a showing of substantial need. NET made no such showing.

■ 4. *Intervenor Beckerman's Witness.* The examiners ordered NET to provide intervenor Beckerman with a witness qualified to testify with respect to directory assistance charges. NET argues that this was error. Section 299 of Title 35 specifically gives examiners the power to compel testimony and to examine witnesses. The

provisions of that section cover the situation. Nothing in the record supports a finding of abuse of discretion by the hearing examiners in this matter.

■ 5. *State of Maine's Public Witness.* NET contends that it was prejudicial error for the examiners to permit the State of Maine, which was not a party at the hearing, to present expert testimony with respect to Centrix Service. The State was at no time a party or intervenor and never sought the rights of a party. The power of hearing examiners to compel testimony under 35 M.R.S.A. § 299 implies the power to permit public witnesses to testify, and the practice of hearing testimony of public witnesses in a rate hearing is not unusual. *See Central Maine Power Co. v. Public Util. Comm'n*, Me., 405 A.2d 153, 156 (1979). The Administrative Procedure Act manifests a legislative intent to encourage public witness participation in administrative hearings. *See* 5 M.R.S.A. § 9054(3) (1979).[6] We find no abuse of discretion by the hearing examiners or any impermissible prejudice to NET as a result of letting the State present a public witness. NET argues also that the testimony did not meet the prefiling deadline for expert testimony set by one of the Commission's procedural orders. Aside from a question whether the procedural order even applied to testimony of nonparty witnesses, there is no evidence in the record of any harm to NET resulting from the admission of the testimony in question.

■ 6. *Cross-examination of Commission Witnesses.* NET contends that the examiners encouraged obstructive and unresponsive behavior on the part of Commission witnesses and thereby effectively deprived NET of the right of cross-examination. The record does not permit this Court to conclude that due process was in fact denied, but it does demonstrate a serious failure on the part of the examiners to control and regulate the course of the hearing pursuant to Commission Rule of Prac-

---

**6.** Subsection 3 of 5 M.R.S.A. § 9054 provides as follows:

3. *Participation limited or denied.* When participation of any person is limited or de-

nied, the agency shall include in the record an entry to that effect and the reasons therefor.

tice and Procedure 7(c). *See also* 5 M.R.S.A. § 9062(3)(C) (1979). Two witnesses presented by the staff frequently proved unresponsive and occasionally obstructive while undergoing cross-examination. While we are unable to conclude that the examiners encouraged such conduct, the record reflects a failure to control and minimize such occurrences. Although reversible error is not demonstrated in this case, it is appropriate to emphasize the responsibility of an examiner to ensure that the hearing process results in full and clear factual development. That responsibility frequently requires the exercise of control over witnesses as well as lawyers. A due-process violation, whether resulting from passive failure to exercise control or active encouragement, would require reversal.

None of the other procedural improprieties that NET asserts require explicit comment by this Court. In sum, although the proceedings in this case are not an exemplar of correct administrative procedure, the total record does not establish that NET was denied a fair hearing.

## III. RATE OF RETURN

An essential function of the Commission in the ratemaking process is the determination of the appropriate rate of return that the petitioning utility will be permitted to earn. Rate of return is the rate that a utility is entitled to earn on its investment and is determined by combining the capital structure of the utility with the proper cost of capital. The purpose of rate of return is to provide a public utility sufficient revenue to cover the company's total costs of service. Those costs include both the operating expenses of the utility and an adequate return on the investment of the utility in property and equipment serving the public. *See Mechanic Falls Water Co. v. Public Util. Comm'n*, Me., 381 A.2d 1080, 1095 (1977).

■ A method often employed by regulatory agencies to determine the fair rate of return for a utility is to analyze the utility's cost of capital. *See* E. Nichols, *Ruling Principles of Utility Regulation* ch. 10 (1955 & Supp. A 1964). Cost of capital is what a utility must earn (expressed as a percentage) in order to secure financing for its operations from equity and debt investors. When competently computed, cost of capital is a satisfactory measure of the fair rate of return, *New England Tel. & Tel. Co. v. Public Util. Comm'n*, Me., 390 A.2d 8, 32 (1978) (hereinafter cited as *1978 NET Case*); *Central Maine Power Co. v. Public Util. Comm'n*, 156 Me. 295, 307, 163 A.2d 762, 769 (1960), and is the method most often used by the Commission to calculate rate of return. Under that method, rate of return is the sum of the weighted costs of different elements of capital, calculated by multiplying the cost of capital for each form of security by its ratio to total capital.[7] Thus, cost of capital includes both the interest the utility must pay on its borrowed capital (debt) and the cost of attracting investors for its common or preferred stock (equity).

One of the more important steps in the calculation of the fair rate of return is the determination of the cost of equity and the cost of debt. To arrive at a reasonable rate of return to NET, the Commission undertook to determine a figure equivalent to the composite cost of capital to the American Telephone & Telegraph Company (AT&T), of which NET is a wholly-owned subsidiary. To reflect accurately the parent-subsidiary relationship of AT&T to NET and the financial advantage resulting from that relationship, the Commission adopted a so-called double-leverage formula in determining NET's cost of equity. On this appeal NET contests the propriety and reasonableness of both the double-leverage adjustment and a finding by the Commission of 14.4% as the cost of equity to AT&T.

A. *Double Leveraging.* In this case the Commission found that the actual capital structure of NET consists of 54.1% equity and 45.9% debt. Because NET is financed

7. A more detailed explanation of the cost-of-capital approach to the determination of rate of return can be found in the *1978 NET Case*, 390 A.2d at 32.

partially by equity and partially by debt, the common shareholders are said to be leveraged to the extent that the cost of debt is lower than the rate of return which they receive for the use of that debt. If no adjustments were made, such leveraging would result in attributing to equity interests a return in excess of the actual cost of equity. To reflect the leveraging, the Commission assigns a weighted cost to the different debt-equity components of the capital structure of the utility, i.e., the cost of each component is multiplied by its ratio to the total capital. In theory at least, the shareholders will then earn on debt only what it cost to obtain debt financing.

Where the utility is a subsidiary of a larger corporation, second-tier or double leveraging occurs. Double leveraging describes the situation where the equity capital of the subsidiary is funded by the combination of both debt and equity in the capital structure of the parent corporation. Unless some adjustments are made, the utility may earn a higher rate of return than it actually costs to secure equity capital. "The principle behind double leveraging adjustments by utility commissions is to account for the parent's alleged use of its low cost debt to purchase stock in its sub-sidiary, upon which it may earn a higher rate of return than it pays for the debt." *1978 NET Case*, 390 A.2d at 41.

NET being a wholly owned subsidiary of AT&T,[8] the investment of AT&T shareholders is doubly leveraged as a result of AT&T's ownership of all NET's stock. The Commission found that if the double leverage enjoyed by the common shareholders of AT&T were not considered in determining NET's rate of return, NET would earn an excessive rate of return at the expense of Maine ratepayers. To correct that perceived inequity and account for NET's status as a subsidiary of AT&T, the Commission made a double-leverage adjustment in determining the cost of equity to NET.

On the basis of the testimony of staff witness Caroline Smith, the Commission found that the capital structure of AT&T consists of 83.7% equity, 3.5% preferred stock and 12.8% debt. The Commission determined AT&T's percentage cost of capital to be 14.4% for common equity, 7.7% for preferred stock, and 6.5% for debt. Those figures were then used to calculate AT&T's composite cost of capital, as outlined in the following table:

TABLE I.

| Item | Percent of Capitalization | Cost | Weighted Cost |
|---|---|---|---|
| Common Equity | 83.7% | 14.4% | 12.05% |
| Preferred Stock | 3.5% | 7.7% | .27% |
| Long-term Debt | 12.8% | 6.5% | .83% |
| Composite Cost of Capital to AT&T (Cost of Equity to NET) | | | 13.15% |

---

The Commission found that the total of the weighted costs (13.15%) represents the return that AT&T is entitled to earn on its investment in NET; in other words, that the actual cost to AT&T for the common equity of NET is 13.15%. Since AT&T owns all the common equity of NET, the Commission determined that 13.15% also represents the true cost of equity capital to NET.

Therefore, the Commission inserted this figure into the actual capital structure of NET, which consists of 54.1% common equity and 45.9% debt. The undisputed cost of debt to NET was found to be 8.05%. On the basis of these figures, the Commission made the following computations:

8. AT&T is an integrated holding company for numerous regional telephone companies, West-ern Electric, and Bell Telephone Laboratories, Inc., known collectively as the Bell System.

TABLE II.

| Item | Percent of Capitalization | Cost | Weighted Cost |
|---|---|---|---|
| Equity | 54.1% | 13.15% | 7.11% |
| Long-term Debt | 45.9% | 8.05% | 3.69% |
| | 100% | | |
| | | Rate of Return | 10.80% |

The Commission thus found that NET was entitled to earn a fair rate of return of 10.80% on its investment after due consideration was given to the double-leverage component attributable to the AT&T/NET parent-subsidiary relationship.

NET contends that the Commission erred in adopting the double-leverage adjustment in its computation of the proper rate of return. It advances three principal arguments in support of its position: (1) that the double-leverage methodology was condemned by this Court in the *1978 NET Case*; (2) that the record contains insufficient evidentiary support for the use of a double-leverage adjustment; and (3) that the use of a double-leverage adjustment is confiscatory.

In the *1978 NET Case*, 390 A.2d at 43, this Court disapproved the application of the double-leverage adjustment in the circumstances of the case, finding that the Commission did not give adequate consideration to the effect of the adjustment on the 14% interest held by minority shareholders in NET. The Court also found that the Commission's application of the adjustment was not supported in that case by substantial evidence and was inconsistent with the Commission's own formulation of the concept. However, in so holding, this Court stated that the "most serious error with respect to the double-leverage adjustment,

and our principal reason for refusing to sustain the Commission on this issue, concerns the existence of the 14% minority." *Id.* at 44. The Court did not universally condemn the use of a double-leverage adjustment by the Commission as NET suggests. In fact, we implicitly recognized double leveraging as a permissible approach for determining the cost of equity. *Id.* at 28 n. 19 & 46 n. 29.

No precedent bars an appropriate use by the Commission of the double-leverage methodology. The principal reason for our remand in the *1978 NET Case*—the fact that the Commission had not given sufficient consideration to the existence of a substantial minority interest—is no longer present: since that decision, AT&T has purchased all outstanding minority shareholdings in NET.[9] As long as the Commission's result and choice of method are reasonable and there is substantial evidence in the record to support them, we must approve their decision. *See Mars Hill & Blaine Water Co. v. Public Util. Comm'n*, Me., 397 A.2d 570, 584 (1979).

NET argues that the Commission should have used the consolidated-capital-structure approach to account for AT&T's influence on the capital structure of NET and that the failure to use such method was unreasonable.[10] The consolidated-capital approach received the endorsement of all witt-

9. It appears from the record that AT&T tendered an offer for all outstanding shares of NET held by minority shareholders. The Commission found nothing in the record indicating that AT&T was not successful in purchasing all minority shares. Finding in the record no evidence of a minority interest, we uphold the Commission's finding that NET is now a wholly-owned subsidiary of AT&T.

10. The Commission in its order stated that the consolidated-capital-structure methodology "uses the capital structure of the parent, with or without adjustments, as a proxy for the subsidiary." *In re New England Tel. & Tel. Co.*, 42 P.U.R.4th 182, 188 (Me.P.U.C.1981).

nesses who testified on capital structure and cost of equity as an appropriate methodology.[11] The Commission rejected the consolidated-capital approach, reasoning that subsidization of the other operating subsidiaries of AT&T would occur if a consolidated-capital structure were used in this case. According to the Commission, the consolidated-capital approach results in a higher cost-of-equity ratio thereby allowing AT&T to collect excessive equity earnings from Maine ratepayers.

NET contends, however, that the use of the double-leverage methodology allocates a disproportionate share of AT&T debt to NET than would the consolidated-capital approach, thereby causing the shareowner to subsidize the ratepayer. It argues that because most other jurisdictions use the Bell System consolidated-capital structure, the Commission's double-leverage adjustment allocates debt to NET already allocated to other jurisdictions.

Whether most other jurisdictions use the consolidated-capital-structure methodology is not clear, but it is clear that not all other jurisdictions use that approach. Many use the double-leverage methodology. *See, e.g., Mountain States Tel. & Tel. Co. v. Department of Public Serv. Reg.*, 624 P.2d 481 (Mont.1981); *Re Mountain States Tel. & Tel. Co.*, Docket No. 1400 (Colo.Pub.Util. Comm'n, Sept. 16, 1980); *Re Southwestern Bell Tel. Co.*, Docket No. 123, 773–u (Kan. State Corp. Comm'n, March 3, 1981). If the Commission's determination of methodology is reasonable and supported by substantial evidence, we must uphold its decision.

■ Careful review of the record convinces us that the Commission's decision to adopt the double-leverage methodology rather than the more traditional consolidated-capital-structure approach was reasonable and supported by substantial evidence. The equity ratio of the Bell System consolidated-capital structure is 49.3%; the effec-

tive equity ratio of NET after adjustment for double leveraging is 45.3%.[12] It was not unreasonable for the Commission to decide that the consolidated-capital approach does not reflect fully the advantage gained by AT&T's shareholders from the fact that AT&T's investment in NET is financed by both equity and lower-cost debt.

Although NET witness John Cogswell, staff witness Caroline Smith, and Mark Langsom, who testified on behalf of the United States Department of Defense, all agreed that the consolidated-capital structure approach was an appropriate method, the Commission rejected it for the reason outlined above. We believe that the reasoning of the Commission is supportable. In certain circumstances, either of two methodologies may be appropriate and supported by the evidence. In such a case, choice of method to determine the proper rate of return belongs to the Commission, which may reject the evidence of one expert and accept that of another in the proper exercise of its ratemaking responsibilities. *Mars Hill & Blaine Water Co.*, 397 A.2d at 585.

The Commission accepted the testimony of staff witness Smith, which substantially supported the adoption of a double-leverage adjustment in determining NET's cost of equity. Accordingly, we find no error in the Commission's adoption of a double-leverage adjustment. However, in making the calculation, the Commission assigned to AT&T's common equity a "bare cost" of 14.4%, and NET challenges the use of that figure as confiscatory in its effect.

B. *AT&T's Cost of Equity.*

■ 1. *General considerations.* Determining the cost of equity is one of the more difficult computations in the rate-making process. The Commission must concern itself with many economic variables and eval-

---

11. Staff witness Smith testified that the double-leverage methodology was the most appropriate method to determine NET's cost of equity but admitted that the consolidated-capital approach could also be used as an alternative.

12. NET's "effective equity ratio" was arrived at by multiplying AT&T's actual equity ratio (83.7%) by NET's actual equity ratio (54.1%) thereby taking into account the effects of double leveraging. See Tables I and II *supra*.

288

uate conflicting evidence interpreting and applying those variables. Because of the complexity of the task, the Law Court necessarily defers to the regulatory expertise of the Commission if the Commission's decision is supported by substantial evidence. We do not attempt to second-guess the Commission on matters falling within its realm of expertise. Our review is limited to determining in the light of the record whether the Commission's conclusions are unreasonable, unjust or unlawful. The utility has the burden of proving that the Commission has erred. 35 M.R.S.A. § 307 (1978); *Central Maine Power Co.*, 156 Me. at 299, 163 A.2d at 765.

Whatever method is used by the Commission, its objective should be to achieve a proper balance between the right of the utility's investors to earn a fair return on their investment and the right of the ratepayers to a fair charge based on the value of the services provided by the utility. *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944). The return on investment calculated by the Commission must not be so unreasonably low as to be confiscatory. *Central Maine Power Co. v. Public Util. Comm'n*, 153 Me. 228, 250, 136 A.2d 726, 739 (1957). As this Court said in the *1978 NET Case*, 390 A.2d at 35, the Commission must be guided by the following principles:

First, the return must be commensurate with returns on investments in other business enterprises having corresponding risks and uncertainties. Second, the return must be sufficient to assure confidence in the financial integrity of the business enterprise so as to maintain its credit and enable it to attract capital.

2. *The testimony.* Only three witnesses gave testimony directly bearing on the cost of equity for AT&T. In supplemental direct testimony, NET witness John Cogswell recommended an unadjusted cost of approx-

imately 15.8% for AT&T equity using a version of the discounted-cash-flow (DCF) method for determining cost of equity and a cost of 16.5% to 18.0% using a so-called "return-spreads" method.[13] Mark Langsom, a witness presented by the United States Department of Defense, believed that the appropriate cost of equity for AT&T was in the range of 13.0% to 14.0% using a comparative-earnings approach. The final witness who testified directly on the cost of equity for AT&T was staff witness Caroline Smith, an economic consultant. Using the DCF method, she recommended a cost of equity for AT&T in the range of 12.5% to 13.5%.

Three of NET's witnesses, William Kraas, Robert Johnson and John Cogswell, testified on the cost of equity for NET without regard to double leveraging. Employing various methods, they concluded that the cost of equity for NET lies in the range of 15.3% to 20.1%. The Commission considered and rejected their testimony, reasoning that such evidence was inappropriate because the approaches used by those witnesses focused on NET directly without recognition of its ownership by AT&T. Having decided that the double-leverage formulation was the most appropriate method for determining the cost of NET equity, the Commission found that any evidence or method which failed to account for the double-leverage component in its cost-of-equity calculations was neither appropriate nor useful.

On the evidence presented, the Commission found the "bare cost of equity" for AT&T to be 14.4%, using the discounted-cash-flow method.[14] NET challenges that finding in a number of respects. First, NET contends that the Commission arbitrarily disregarded most of the testimony of its witnesses concerning the cost of both AT&T and NET equity and capriciously refused to consider any testimony other than Cogswell's and Smith's DCF ap-

13. For a brief description of a "return spreads" approach, *see 1978 NET Case*, 390 A.2d at 35.

14. For comments on the Commission's use of a DCF formula in calculating the cost of equity in

the *1978 NET Case, see Mars Hill & Blaine Water Co. v. Public Util. Comm'n*, Me., 397 A.2d 570, 585 n. 16 (1979).

proaches for determining the cost of AT&T equity.

■ It is unnecessary to review the testimony of each of the witnesses. The acceptance of one witness's testimony and the rejection of another's is within the sound discretion of the Commission. The Commission's order reflects consideration of all the evidence presented on AT&T's cost of equity and states adequately the Commission's reasons for deciding as it did. That the Commission chose to rely principally on the DCF method to determine the cost of AT&T equity as the basis for its double-leverage approach to determining the cost of NET equity is not ground for setting aside its decision.[15]

3. *Discounted-cash-flow analysis: "bare cost of equity."* Discounted-cash-flow analysis involves the computation of a capitalization rate that indicates the investor's required return. That rate, or the "bare cost of equity," is determined by combining the anticipated dividend yield with the expected growth rate in dividends per share.

(a) *Dividend yield.* The first step in DCF analysis is calculation of the dividend yield which is expressed as a percentage by dividing the appropriate dividend by the estimated market price of the stock. In this case, the Commission took official notice of the current annual dividend of $5.40 for AT&T common stock and found a representative average market price of $50.87 for that stock. Combination of the two figures produced an annual dividend yield of 10.6%. NET does not specifically challenge the propriety or reasonableness of this finding.

(b) *Expected growth rate.* The second step in DCF analysis is determination of the expected growth rate in dividends per share. On this determination the parties disagree. The Commission found an expected long-term growth rate of 3.8%. NET contends that this finding was unrea-

sonable, confiscatory and without sufficient support in the evidence. On the contrary, we find that the Commission's determination is reasonable in result and methodology and supported by substantial evidence in the record. We sustain the Commission's finding that the expected growth rate of AT&T stock is 3.8%.

In finding an expected growth rate of 3.8% for AT&T, the Commission relied principally on an "historical-growth-period" analysis presented by staff witness Smith, who analyzed long-term growth rates in earnings, dividends and book value over a ten-year period beginning in 1962 and ending in 1972. From that data, Smith concluded that the long-term expected growth rate in AT&T dividends is 3.5%. The Commission rejected Smith's result because her analysis was limited to a ten-year period ending in 1972. Accordingly, the Commission analyzed the growth rate in AT&T dividends over a twenty-year period, 1960 to 1980, deciding as a result that a growth rate of 3.8% was reasonable.

According to the Commission, its finding of a 3.8% growth rate by means of a historical-period analysis was confirmed and supported by the "implicit-growth-rate" methodology used by NET witness Cogswell. Under that method, AT&T's payout ratio over a number of years is combined with the equity return over a number of years. Cogswell used the payout ratio over the past twenty years (60%) and the equity return on the two most recent years (13%) to reach an implicit growth rate of 5.2% (13% return × 40% retained = 5.2% growth). This he described as being at the bottom of the reasonable range of investor expectations. However, the Commission found Cogswell's analysis faulty in combining a payout ratio over a twenty-year period with an equity return over only a two-year period. Instead, the Commission compared the average payout ratio (62%) over

---

15. NET's argument, in part, is premised on the belief that the adoption and use of the double-leverage methodology by the Commission for determining the cost of NET equity was error as a matter of law. NET thus argues that rejection of testimony because it did not con-

sider the relationship between AT&T and NET and the double-leverage component was arbitrary and capricious. We disagree. Since the Commission's use of a double-leveraging formula was within its discretion, it had sufficient reason for rejecting the testimony in question.

the 1960–1980 period with the average equity return (10.1%) over that same period, thereby obtaining an implicit growth rate of 3.8% (10.1% return × 38% retained = 3.8% growth). That finding tended to confirm the Commission's finding of growth rate based on its historical-period analysis.

◼ Having found the dividend yield to be 10.6% and the growth rate to be 3.8%, the Commission determined the bare cost of equity for AT&T under DCF analysis to be 14.4% (10.6% + 3.8% = 14.4%). Contrary to NET's assertions, the DCF analysis used by the Commission is an appropriate method in this case for determining the bare cost of equity, and the historical-growth period studied by the Commission was a reasonable method for determining the equity-growth rate of AT&T. Choice of ratemaking methods to compute such variables as bare cost of equity, "at least in the realm where rational persons could disagree," belongs to the Commission. *Mars Hill & Blaine Water Co. v. Public Util. Comm'n*, Me., 397 A.2d 570, 585 (1979). The evidence of record is sufficient to support the Commission's analysis and finding.

4. *Discounted-cash-flow analysis continued: "dilution."* As traditionally used, DCF analysis yields a bare cost of equity which may not be a wholly adequate measure of a utility's actual cost of equity. *See, e.g., 1978 NET Case*, 390 A.2d at 36–37; *cf. Mars Hill & Blaine Water Co.*, 397 A.2d at 587 (discussing bare cost of equity but not deciding whether use of DCF requires dilution adjustment). If, after deduction of the costs of issuance, the net proceeds of a public sale of the utility's stock amount to less than the stock's book value, the issuance of stock results in the utility's receiving less from investors than the book value of its present stock, with the effect of reducing the overall average book value of each share of stock. The net result is a dilution of the book value of existing shares. Accordingly, the return on equity must be high enough to compensate for that dilution of value if and when new shares are issued.

"Market-to-book ratio" represents the measure of how much greater the market value of the stock must be over its book value in order to prevent dilution of the investment of existing shareholders. Although NET witness Cogswell testified that a market-to-book ratio of at least 1.1 would be required, the Commission refused to provide such an adjustment. The Commission stated that it had no responsibility to provide such a margin, reasoning that it need not make a market-to-book ratio adjustment where the utility has not shown that a new public issuance of equity is likely in the immediate or near future. Since NET had presented no persuasive evidence that such a public issuance was impending or even reasonably probable in the foreseeable future, the Commission held that a market-to-book ratio adjustment was unwarranted. NET argues that the Commission erred in so holding.

◼ It is a fundamental precept of Maine public utility law that a regulated utility has a constitutional right to earn a "sufficient return to maintain its credit and to obtain additional capital when needed to enable it to serve its public." *Central Maine Power Co. v. Public Util. Comm'n*, 153 Me. 228, 251, 136 A.2d 726, 740 (1957), *quoting New England Tel. & Tel. Co. v. Department of Public Utilities*, 327 Mass. 81, 94, 97 N.E.2d 509, 516 (1951). Consequently, in determining the fair rate of return, proper consideration must be given to the prevention of dilution in order to enable the utility to obtain additional capital if and when needed. Where DCF analysis is used, the Commission should consider a market-to-book ratio where evidence warranting such an adjustment is presented, *see 1978 NET Case*, 390 A.2d at 36–37, and failure to do so and to make a compensatory adjustment may result in confiscation. *Maine Water Co. v. Public Util. Comm'n*, Me., 388 A.2d 493, 496 (1978).

◼ The Commission found that the evidence of record did not support the proposition that a new public issuance of equity by AT&T was likely to occur "during the period of effectiveness of the new rates."

NET's evidence had consisted of market letters from investment analysts which, while supportive of a dilution allowance in general, did not tend to show that a public issuance of common equity by AT&T was at all imminent. Indeed, one of those market letters, dated October, 1980, concluded by saying, "It is quite clear that the Company will do no equity financing outside of these plans [*viz.*, a dividend reinvestment plan and an employee savings plan] in the foreseeable future." There is no evidence in the record to suggest that the Commission knew or should have known, before it issued its decree, about the stock issuance by AT&T that actually occurred in June, 1981, a few months after the Commission rendered its decree. From this record it cannot be held as a matter of law that NET met its burden of proving that a new common equity issuance was so likely in the then foreseeable future that the Commission was required to factor a dilution allowance into its determination of AT&T's cost of equity.

 5. *Confiscation argument on cost of capital.* Finally, NET objects to the Commission's findings of a 14.4% cost of equity for AT&T and a 13.15% cost of equity for NET as confiscatory. NET contends that this is evident when the Commission's findings are compared with higher cost-of-equity figures found by certain other utility commissions and with its own actual cost of debt incurred after promulgation of the Commission's order. This argument is unpersuasive because it ignores two salient principles of Maine public utility law; namely, first, that we review the Commission's determinations on the basis of standards heretofore elaborated by this Court and not on the basis of what other utility commissions have found, *1978 NET Case*, 390 A.2d at 38, and, second, we will not review the reasonableness of the Commission's findings on the basis of evidence out-

side the record introduced for the first time on appeal. *See Central Maine Power Co. v. Public Util. Comm'n*, Me., 433 A.2d 331, 343 n. 6 (1981). Hence the actual cost of debt incurred by NET after promulgation of the Commission's order is not relevant in this appeal. This Court has no basis for holding that the Commission's findings on AT&T's or NET's cost of capital are confiscatory in effect. *See Camden & Rockland Water Co. v. Maine Public Util. Comm'n*, Me., 432 A.2d 1284, 1286–87 (1981).

C. *Summary.* We uphold, as reasonable and supported by substantial evidence, the Commission's use of the double-leverage formulation in determining NET's cost of equity, its finding of 14.4% as the cost of equity for AT&T, and its finding of 13.15% as the cost of equity for NET.

## IV. RATE BASE

 The rate base is the value of the utility's investment on which it is allowed to earn a return and is limited to "all property ... used or required to be used in its service to the public within the State." 35 M.R.S.A. § 52 (1978); *Camden & Rockland Water Co. v. Public Util. Comm'n*, Me., 432 A.2d 1284, 1286 (1981). The rate base multiplied by the fair rate of return equals the fair return on investment to which the investors in the utility are legally entitled. NET contests certain of the Commission's decisions on what is properly includable in NET's rate base.

A. *Short-term Construction Work in Progress.* In its order, the Commission excluded $4,877,000 of short-term construction work in progress (CWIP)[16] from NET's rate base. NET claims that this exclusion was error, violating the Uniform System of Accounting, 47 C.F.R. part 31 (1981), which has been adopted by the Commission and governs telephone company accounting

---

16. NET prefers the use of the expression "telephone plant under construction" and its acronym, "TPUC," instead of "CWIP." The FCC accounting regulations for telephone companies refer to "telephone plant under construc-

tion." Finding no significant difference between the two terms in the context of the issues presented here, we have used the term of more general applicability.

techniques. *See* Commission Reg. 21(1)(A) (1979).[17]

CWIP is the "cost of utility operating property in the process of construction but not ready for service at the date of the test-year balance sheet." *In re Central Maine Power Co.*, 26 P.U.R.4th 388, 401 (Me.P.U.C.1978). At least for accounting purposes in the case of a telephone company, short-term CWIP (or TPUC) is telephone plant designed to be completed in one year or less, and long-term CWIP (or TPUC) is telephone plant designed to be completed in over one year. 47 C.F.R. § 31.100:2 (1981). Historically, for rate-making purposes, the Commission has either excluded all CWIP from a utility's rate base or included average CWIP in the rate base and included in the test-year income statement an allowance for funds used during construction (AFUDC) as an *income* item.[18] AFUDC reflects the cost of capital expended on CWIP before the plant has been placed in service. The purpose of the adjustments is to prevent ratepayers from paying for a return on an investment in plant from which they have not yet derived service.

The Commission states that in past NET rate cases it has included all CWIP in rate base and made an AFUDC adjustment on the income statement, capitalizing the interest on contruction during the construction period. Although the Commission prefers this approach in NET rate cases, it was unable to treat NET's CWIP in that way because the necessary data for computing the AFUDC were not presented.

NET proposed to include only short-term CWIP in rate base without capitalizing any of the interest during construction. In other words, NET sought to include short-term CWIP in rate base without a corresponding AFUDC adjustment in the income statement. According to NET, such treatment of short-term CWIP is required by a change in the Uniform System of Accounting promulgated by the Federal Communications Commission (FCC). 47 C.F.R. part 31 (1981). That change, which became effective January 1, 1979, was the result of an FCC Report and Order, published May 17, 1978. 43 Fed.Reg. 21330 (May 17, 1978). Giving the FCC accounting rule substantive effect, NET argues that it requires all short-term CWIP (or TPUC) to be included in a telephone company's rate base. Furthermore, since there is to be no accrual of interest in the short-term TPUC account, NET contends that the Commission is barred from making any AFUDC adjustment in the test-year income statement, citing 47 C.F.R. § 31.100:2(c) (1981).[19]

---

**17.** Commission Reg. 21(1)(A) provides:
Every telephone company as defined in 35 M.R.S.A. § 15, shall maintain its books in the manner and a form prescribed by:
1) Uniform System of Accounts for telephone companies 1939 revised, or;
2) Federal Communications Commission Uniform System of Accounts 47 C.F.R. 31 as published in June, 1978.

**18.** For a fuller explanation of the Commission's treatment of AFUDC see *Central Maine Power Co. v. Public Util. Comm'n*, Me., 433 A.2d 331, 342 (1981).

**19.** 47 C.F.R. § 31.100:2 (1981) provides as follows:
§ 31.100:2 Telephone plant under construction.
(a) This account shall include the original cost of construction of telephone plant, other than station apparatus and station connections, that is not completed ready for service. It shall include interest during construction, as provided for in paragraph (d) of this sec-

tion, taxes during construction, and all other elements of cost of such construction work. (Note also §§ 31.2–20 to 31.2–22 and account 231.)
(b) This account shall be subdivided so as to show separately the cost of construction projects (1) designed to be completed in one year or less and (2) designed to be completed in over one year.
(c) When plant includible in subdivision (1) is not ready for service at the end of one year, the cost of construction of the plant shall be transferred to subdivision (2) of this account without further direction or approval by this Commission. If a construction project has been suspended for six months or more, the cost of the plant includible in subdivision (1) shall be transferred to subdivision (2) of this account without further direction or approval by this Commission. No interest during construction shall be accrued on plant included in subdivision (1) of this account. No amount of interest during construction shall be accrued retroactively in

The Commission rejected NET's proposal, reasoning that inclusion of short-term CWIP in rate base without an AFUDC adjustment does violence to the test-year concept. The test-year concept matches revenues, expenses and rate base in an attempt to ensure a consistent relationship for measuring an appropriate level of return that the utility can reasonably be expected to earn during a twelve-month period. *See generally Camden & Rockland Water Co. v. Public Util. Comm'n,* Me., 432 A.2d 1284 (1981). According to the Commission, ratepayers should pay charges only for plant that is in use or useful, and to include short-term CWIP in rate base in the test year without making an AFUDC adjustment results in the ratepayers' paying for plant which is not in use or useful during the test year.

The FCC summarized the 1978 Report and Order instituting its changes in the system of accounts for telephone companies by stating that the amendments thereby made were to provide "the rate base and expense treatment" of certain items, among them telephone plant under construction (TPUC). 43 Fed.Reg. 21330 (May 17, 1978). NET contends that the Commission, by refusing to include short-term CWIP in NET's rate base without capitalizing interest accrued during construction, has arbitrarily disregarded the method by which NET is required to keep its books of account. NET argues that after the Commission has prescribed the method by which NET must keep its books of account, it cannot thereafter disregard that bookkeeping method in the process of ratemaking.

Commission Regulation 21(1)(A) prescribes for telephone utilities the use of the FCC Uniform System of Accounts for Class A and Class B Telephone Companies, which requires NET to carry an account for TPUC (or CWIP) in two subdivisions, one for short-term and the other for long-term TPUC. The FCC system seems to contemplate that no interest during construction shall be accrued on plant that is included in the short-term subdivision of the TPUC account. NET argues that therefore the Commission may not compensate for inclusion of short-term CWIP (or TPUC) in rate base by an AFUDC adjustment since AFUDC requires capitalization of interest.

The Commission contends that its treatment of short-term CWIP was not arbitrary, but reasonable and supported by substantial evidence. The Commission observes that the FCC, in making the change in the Uniform System of Accounts, expressly noted that the change was not intended to influence the intrastate ratemaking decisions of state utility commissions or to impinge on their ratemaking prerogatives. FCC Report and Order, 43 Fed.Reg. 21330, 21332 (May 17, 1978). The Commission further argues that it may disregard the method by which a utility keeps its books of account, even though it may have prescribed that method, if not going beyond those books of account would result in an improper determination of rate base under the test-year concept.

■ Generally speaking, the Commission is not bound by a utility's books of account in setting rates. *1978 NET Case,* 390 A.2d at 23. However, if the Commission prescribes the method by which the utility must keep its books, the Commission

---

this account for any telephone plant which was once included in subdivision (1) of this account.

(d) When the cost of telephone plant has been included in subdivision (2) of this account, interest during construction shall be accrued, as provided for in § 31.2–22(b)(10).

(e) When any telephone plant, the cost of which has been included in this account, is completed ready for service, the cost thereof, shall be credited to this account and charged to the appropriate telephone plant or other accounts. No reversal of interest during construction on property estimated to be completed in over one year but completed earlier is necessary.

NOTE: There may be charged directly to the appropriate plant accounts the cost of any construction project which is estimated to be completed and ready for service within two months. There may also be charged directly to the plant accounts the cost of any construction project for which the gross additions to plant are estimated to amount to less than $25,000.

may not disregard those books arbitrarily and without reason in the process of rate-making. *Id.* In this case, we cannot find that the Commission acted arbitrarily in going beyond the prescribed method of accounting, as it did, in order to determine the rate base in accordance with its traditional practice. Although 47 C.F.R. § 31.-100:2, as incorporated in the Commission's regulations, may be read as requiring NET to carry short-term CWIP in rate base for accounting purposes, the Commission was justified in this case in not regarding that accounting treatment as creating an absolute substantive limitation on its determination of NET's rate base and test-year income statement.

If short-term CWIP were included in rate base without an AFUDC adjustment in NET's test-year income statement, the effect would be to authorize revenue on telephone plant not in service during the test year. Since the purpose of the test-year concept is to match revenues, expenses and rate base during a particular twelve-month period, the Commission is correct in deciding that inclusion of a short-term CWIP without an offsetting AFUDC adjustment would distort the test-year computations. The result would be that ratepayers would pay for construction work that yielded them no services during the test year. Before it comes on line, construction work in progress or telephone plant under construction is not "property . . . used in [the utility's] service to the public within the State." *See* 35 M.R.S.A. § 52.

It is immaterial that some of the construction work in progress is likely to be completed and go into service in the near future. A basic assumption of the test-year concept is that, over all, the test year is representative of the foreseeable future. The elements that go into the test-year computations of income and expense are not scrutinized individually to determine the degree of likelihood that particular items will recur or disappear or change in the relatively near future. To permit such scrutiny would be to make the test-year concept unworkable as a device for prediction of net revenues.

That NET included short-term CWIP in a rate-base account pursuant to an accounting regulation is not dispositive. As the FCC stated in its 1978 Report and Order, the change in treatment of short-term CWIP was not intended to influence the ratemaking decisions of state commissions. There is much to be said for coordinating the accounting techniques used by NET and the FCC with those employed by the Commission for ratemaking purposes, especially where the Commission prescribes those accounting methods, and it would have been wise for the Commission, at the time of adopting its Regulation 21(1)(A), to signal to telephone companies its intention with respect to future treatment of TPUC in the ratemaking process. Nevertheless, we cannot hold that the Commission arbitrarily or capriciously disregarded NET's books of account in this case.

NET contends alternatively that the Commission should have included NET's short-term CWIP in rate base with an appropriate AFUDC adjustment instead of merely excluding all short-term CWIP. The Commission does not deny that an AFUDC adjustment would have been acceptable but claims that NET failed to present any evidence to support a computation of the adjustment. Recognizing that NET might not have that information readily available because it had proceeded under the new FCC accounting regulations, the Commission offered NET the opportunity to present the evidence later by means of a petition for reopening. In the petition for reopening, NET stated that it was unable, without substantial delay, to reconstruct the appropriate data for an allowance.

The Commission acted reasonably in this matter. NET's failure to compile the appropriate data is not excusable on the ground that its books were being kept according to the amended FCC Uniform System of Accounts. It does not appear why the necessary information could not have been extracted and compiled with a reasonable amount of effort and within a reasonable period of time. The adjustment for

AFUDC had traditionally been required by the Commission when it permitted inclusion of CWIP in rate base, and NET would have been well-advised not to rely on the Commission's adoption of Regulation 21(1) as implying that the Commission would certainly abandon its former practice. After all, the FCC promulgated its Uniform System of Accounts primarily in the interest of regulating the interstate aspects of the telephone companies subject to its jurisdiction, and it was careful to make clear that its changes in accounting regulations were not to be regarded as in any way an attempt to influence intrastate ratemaking decisions. 43 Fed.Reg. 21330, 21332 (May 17, 1978). That the FCC had no intention of supplanting state regulatory practices is strongly suggested by the FCC's statement in its 1978 Report and Order that "these revisions will provide the plant under construction . . . *in a more detailed manner.*" *Id.* (Emphasis supplied.)

■ Accordingly we hold that the Commission's exclusion of $4,877,000 of short-term CWIP from rate base without an AFUDC adjustment in NET's income statement was reasonable as long as NET did not supply the data necessary for computing the compensating AFUDC offset.

■ B. *FICA ("Federal Insurance Contributions Act") Tax Payment Lag.* In addition to fixed plant and property, rate base must include an allowance for working capital, namely, additional funds provided by investors for meeting daily operating expenses that must be paid before revenues associated with those expenses are received. *See generally 1978 NET Case,* 390 A.2d at 51. As described by the Commission, the amount of working capital needed is determined

> by conducting a lead-lag study which computes the time intervals between: (1) the time that service is provided by the company and the time the company receives payment for that service and (2) the periods for which various expenses

are incurred by the company and the date that those expenses must be paid. These two intervals, the former of which is the payment lag and the latter of which is the expense lag are combined to reach a net interval. This interval is then multiplied by the company's average daily expenses to determine the necessary working capital.

*In re New England Tel. & Tel. Co.,* 42 P.U.R.4th 182, 203 (Me.P.U.C.1981).

NET asserts that the Commission erred in finding an 11.29-day expense lag for the payment of FICA taxes. It contends that the Commission's calculation is based on the erroneous assumptions that FICA taxes are directly related to the payment of payroll and that the expense is incurred at the midpoint of each payroll period. According to NET witness Thomas McBrierty, the FICA taxes are an annual expense and the FICA expense lag should be calculated on an annual basis. McBrierty therefore computed the FICA payment lag from the midpoint of the fiscal year arriving at a 1.09-day expense lag.

The staff's expert Albert Clark agreed with NET's expert McBrierty that an expense should be associated with the period for which it is paid, but disagreed about the determination of that expense period. The staff argued that since the treasury regulations provide that the "employer [FICA] tax attaches at the time that the wages are paid by the employer," Treas.Reg. § 31.-3111–3 (1981), the FICA tax expense is incurred when wages are paid. Staff witness Clark thus computed the lag period from the midpoint of the pay period.

NET contends that the time that FICA tax liability attaches is irrelevant and asserts that FICA taxes are an annual tax, paid during the test year on a quarter-monthly schedule prescribed by the regulations. *See* Treas.Reg. § 31.6302(c)–1(a)(1)(ii)(b) (1981).[20] Neither these regulations nor any others called to our attention

**20.** The FICA tax payment schedule for the calendar years beginning after December 31, 1980, requires the employer generally to pay FICA taxes on an eighth-monthly (*sic*) basis. 26 C.F.R. § 31.6302(c)–1(a)(1)(i)(b) (1981).

explicitly defines the period for which FICA taxes are paid. NET's argument rests largely on the provisions of the Internal Revenue Code, I.R.C. § 3121(a), and Treasury Regulation § 31.3121(a)(1)–1(a), that establish an annual maximum amount of FICA taxes an employer must pay per individual employee. From those provisions NET argues that the period for which FICA taxes are paid must be an annual period. The argument is not persuasive.

■ The Commission's determination of the expense lag for payment of FICA taxes is reasonable and supported by sufficient evidence. Clearly under the treasury regulations, the employer's FICA tax attaches pro rata when wages are paid by the employer. Treas.Reg. § 31.3111–3 (1981). If FICA tax liability attaches when wages are paid, a reasonable inference is that the period for which the tax is paid is directly related to the wage period. For example, if employee X is paid once every two weeks, the employer's FICA tax liability attaches when X is paid at the end of each two-week period. The employer is then liable for a specific amount of FICA tax. The period for which the tax is paid is the two-week period during which X was earning wages. The fact that X's wages over and above some certain amount per year are not to be included in measuring the FICA tax is irrelevant to ascertaining the period of expense lag between the time X rendered his services and the time the employer's FICA tax becomes payable. The Commission's method for measuring NET's expense lag in payment of FICA taxes is thus reasonable. The Commission's application of that method, being supported by substantial evidence, must be upheld. *Mars Hill & Blaine Water Co.*, 397 A.2d at 585.

## V. EXPENSE ADJUSTMENTS AND DISALLOWANCES

### A. *Separations Disallowances.*

Proper ratemaking for NET requires separating property attributable to intrastate service from that attributable to interstate service to insure that NET's Maine test-year income-and-expense statement reflects only the cost of intrastate service and that NET is compensated for the expenses of such service. The recovery of interstate service costs is regulated by the Federal Communications Commission (FCC). NET complains that the Commission improperly allocated to the interstate jurisdiction certain costs that have been traditionally allocated to the intrastate jurisdiction. The allocations complained of, which involve foreign exchange (FX) service minutes of use and certain administrative adjustments, resulted in a downward adjustment of $1,301,400 in NET's expenses account and a concomitant downward adjustment of $842,000 in the Maine rate base.

1. *Foreign Exchange (FX) Minutes of Use.* FX service allows a customer located in city A to obtain local-business-line service in distant city B by paying a set monthly charge for a dedicated private line. The FX customer can then place calls to and receive calls from the city B exchange without incurring any toll charges. Whenever the FX service involves exchanges in different states, regulatory jurisdiction is divided between the FCC and the interested state commissions. In the present case, NET assigned the costs associated with interstate FX *lines* wholly to the interstate jurisdiction but assigned the costs associated with FX minutes of use [21] —even in interstate FX service—entirely to the intrastate jurisdiction. Believing the latter allocation by NET to be improper, the Commission staff argued that correct assignment of the costs associated with interstate FX minutes of use would place those costs within the interstate jurisdiction. The Commission agreed with the staff and accepted the calculations of staff witness Allen Buckalew, reducing NET's expenses and rate base for calculating Maine rates.

NET contends that the Commission's allocation of interstate FX minutes of use to interstate jurisdiction was error, arguing that the federal government has preempted the field of federal-state separation of tele-

---

21. *I.e.*, costs of local exchange services.

phone plant used for both interstate and intrastate services so that the Commission is without authority to regulate in this area. Alternatively, NET contends that the Commission's refusal to allocate FX usage to the intrastate jurisdiction creates a hiatus between the federal and Maine jurisdictions: since the FCC allocates *all* FX minutes of use to the intrastate jurisdiction, some portion of plant and expenses would not be included in either jurisdiction under the Maine Commission's ruling. By creating that hiatus, NET argues that the Commission acted unreasonably, arbitrarily, and in disregard of the goal of uniformity in the separations field.

■ We do not decide whether Congress by statute or the FCC by regulation has preempted the field of federal-state separation of joint telephone plant, for we hold that it was unreasonable for the Commission, in this case, to allocate costs associated with interstate FX minutes of use to the

interstate jurisdiction contrary to the present practice of the FCC. We reach that conclusion after careful examination of the federal statutory scheme and the interrelationship between federal and state regulation of telephone plant used jointly for both interstate and intrastate communications.

The provisions of the Communications Act of 1934, which define the FCC's authority with respect to the communications industry, apply to "all interstate and foreign communication by wire or radio." 47 U.S.C. § 152(a) (1976).[22] In general, jurisdiction over intrastate communication service by wire or radio remains in the states. 47 U.S.C. §§ 152(b) & 221(b) (1976 & Supp. 1980).[23] Under the Act, the FCC is empowered to classify the property of carriers engaged in wire telephone communication and to "determine what property of said carrier shall be considered as used in interstate or foreign telephone toll service." 47 U.S.C. § 221(c) (1976).[24] This classification

---

**22.** 47 U.S.C. § 152 (1976 & Supp.1980) provides, in pertinent part, as follows:

(a) The provisions of this chapter shall apply to all interstate and foreign communication by wire or radio and all interstate and foreign transmission of energy by radio, which originates and/or is received within the United States, and to all persons engaged within the United States in such communication or such transmission of energy by radio, and to the licensing and regulating of all radio stations as hereinafter provided....

(b) Except as provided in section 224 of this title and subject to the provisions of section 301 of this title nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier ....

Section 224 relates to pole attachments. Section 301 relates to licensing for radio communication or transmission of energy. Its provisions express the purpose of maintaining federal control over all the channels of interstate and foreign radio transmission.

**23.** 47 U.S.C. § 221(b) (1976) provides as follows:

(b) Subject to the provisions of section 301 of this title, nothing in this chapter shall be construed to apply, or to give the Commission jurisdiction, with respect to charges, classifications, practices, services, facilities, or regulations for or in connection with wire,

mobile, or point-to-point radio telephone exchange service, or any combination thereof, even though a portion of such exchange service constitutes interstate or foreign communication, in any case where such matters are subject to regulation by a State commission or by local governmental authority.

"Carrier" is defined in 47 U.S.C. § 153(h) (1976) as follows:

(h) 'Common carrier' or 'carrier' means any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or in interstate or foreign radio transmission of energy, except where reference is made to common carriers not subject to this chapter; but a person engaged in radio broadcasting shall not, insofar as such person is so engaged, be deemed a common carrier.

**24.** 47 U.S.C. § 221(c) (1976) provides as follows:

(c) For the purpose of administering this chapter as to carriers engaged in wire telephone communication, the Commission may classify the property of any such carrier used for wire telephone communication, and determine what property of said carrier shall be considered as used in interstate or foreign telephone toll service. Such classification shall be made after hearing, upon notice to the carrier, the State commission (or the Governor, if the State has no State commission) of any State in which the property of said carrier is located, and such other persons as the Commission may prescribe.

is to be made only after a hearing and upon notice to the carrier and the regulatory commission of any state where the carrier's property is located. *Id.* Separation of telephone plant used in common for both interstate and intrastate services is thus an integral part of FCC ratemaking and control over interstate communications.

Similarly, 35 M.R.S.A. § 51 (1978) imposes on the Commission the duty and responsibility of setting just and reasonable rates for utility service rendered within the State of Maine. In so doing, the Commission must fix a reasonable value upon all the utility's property used or required to be used in its service to the public within the State. 35 M.R.S.A. § 52 (1978). Because NET is engaged in furnishing both interstate and intrastate communication service, the Commission must separate, for valuation purposes, property used in connection with furnishing intrastate service from that used in connection with furnishing interstate service. Failure by the Commission to make properly such jurisdictional separations may constitute reversible error. *See City of Calais v. Calais Water & Power Co.*, 157 Me. 467, 174 A.2d 36 (1961); *New England Tel. & Tel. Co. v. Public Util. Comm'n*, 148 Me. 374, 94 A.2d 801 (1953).

As the state and federal statutory schemes reveal, both the FCC and the Commission must engage in making jurisdictional separations for the purpose of ratemaking. If each agency acts wholly independently of the other in the separations process, the result will be conflicting decisions on whether particular property falls within the interstate or intrastate jurisdictional sphere. Accordingly, the FCC, state utility commissions and the affected telephone carriers have endeavored to achieve a uniform method for making jurisdictional separations. The result of their endeavor is the *Separations Manual*, jointly issued in 1971 by the FCC and the National Association of Regulatory Utility Commissioners (NARUC). The *Separations Manual* is intended to provide an outline of uniform separations procedures; *i.e.*, procedures for separating telephone property costs, revenues, expenses, taxes and reserves between state and interstate jurisdictions. *Separations Manual* §§ 11.11 & 11.12. The FCC has incorporated by reference the *Separations Manual* as Part 67 of its rules and regulations, 47 C.F.R. § 67.1 (1981), and the Maine Commission concedes that it is normally guided by the *Separations Manual* in its separations determinations.

The attainment of uniformity in the area of jurisdictional separations is important. Otherwise a hiatus between jurisdictions will develop, creating a situation where certain costs of plant and expenses associated with that plant will not be included in either jurisdiction, with the possible consequence that a telephone carrier may be deprived of a fair rate of return when interstate and intrastate jurisdictions are both taken into account.

In this case, the Commission assigned the costs associated with interstate FX minutes of use to the interstate jurisdiction on the theory that it was applying the actual-use standard enunciated in *Smith v. Illinois Bell Tel. Co.*, 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255 (1930). According to that standard, the Commission's prime consideration should be the actual use to which the telephone plant is put. The Commission claims to have relied on that standard, which has been accepted by this Court as a guiding principle in the making of separations determinations. *See New England Tel. & Tel. Co. v. Public Util. Comm'n*, 148 Me. 374, 389, 94 A.2d 801, 808–09 (1953). It claims also that its allocation of FX minutes of use to the interstate jurisdiction is not in conflict with the *Manual*. However, the Commission's application of the actual-use standard in this case is more apparent than real and its allocation of the costs in question to the interstate jurisdiction runs counter to FCC practice and the understanding of FCC and NARUC in adopting the procedures set forth in the *Manual*.

The method by which the Commission made its allocation was a method prescribed in the *Manual* for allocating the costs associated with non-traffic-sensitive (NTS) plant in WATS and MTS services, which

are different from FX and CCSA services.[25] In doing so, the Commission took an approach that was not contemplated by the FCC and NARUC when they promulgated the *Manual.* The current separations procedures in the *Manual* were developed on the theory that the plant costs associated with FX and CCSA minutes of use would continue to be counted as intrastate rather than interstate. *In re Hawaiian Tel. Co.*, 87 F.C.C.2d 864, 872 (1981).

It is true that there is an element of arbitrariness in the FCC treatment of plant costs of interstate FX private-line service, for such costs have both interstate and intrastate components. For precisely the

same reason, however, the Commission's treatment of NET in the present case, allocating those costs entirely to the interstate jurisdiction, is also open to criticism for arbitrariness. Although the FCC's treatment does not reflect precisely the actual use to which telephone plant is put when interstate FX service is rendered, it does accommodate an intricate balancing of factors, including certain trade-offs, in the complicated field of telecommunications regulation.[26] Although, as the Commission points out, the FCC is in the process of reviewing the propriety of assigning open-end private-line services wholly to the intrastate jurisdiction, it is doing so largely

**25.** The FCC allocates costs associated with common control switching arrangements (CCSA) with off-network access lines (ONALS) in the same manner as foreign exchange (FX) costs of plant. *In re Hawaiian Telephone Co.*, 87 F.C.C.2d 864, 868 (1981).

The actual use of telephone lines for interstate or intrastate calls can be determined from the telephone company's time records of interstate toll calls. However, the amount of interstate or intrastate use of non-traffic sensitive (NTS) plant, switching facilities and associated expenses cannot be determined directly from the records. The interstate or intrastate component of these costs is calculated by developing a ratio known as the "subscriber plant factor" or SPF, which is applied to relevant investments and expenses in order to allocate the proportionate share of those costs to the interstate jurisdiction. The SPF is derived from the "subscriber line usage" (SLU) ratio, which is a ratio of the total interstate minutes of use to the combined total interstate and intrastate minutes of use. *See Separations Manual* § 23.444.

SPF is used to allocate plant that is used for interstate message telecommunications service (MTS) and wide-area telecommunications service (WATS). The effect of the SPF is to shift to the interstate jurisdiction "over three times the local carrier's costs of providing exchange service [in the form of NTS plant such as MTS and WATS] than would occur on a strictly relative use basis." *In re Hawaiian Tel. Co.*, 87 F.C.C.2d at 872.

**26.** *See In re Pacific Tel. & Tel. Co.*, 88 F.C.C.2d 934, 942 (1981):

[W]e are aware of the views of some carriers (which are evidently shared by the New York and California State Public Utility Commissions) that costs assigned to interstate services as a result of FX usage are not sufficient compensation for use of local exchange facilities. However, we view this result as a product of the Ozark Plan, the last

State-Federal agreement for allocating exchange plant costs to be incorporated into the Separations Manual. Under this arrangement interstate 'message' services (MTS and WATS) are weighted approximately 3.3 times the costs that would be allocated on a strict relative use basis. In contrast, FX, CCSA, and other private line open end minutes of use have not been subjected to the weighting formula. In a sense, this treatment of open end FX, CCSA, and other private line minutes was a quid pro quo for the heavy weighting associated with other interstate minutes. While we have instituted proceedings, including the designation of a Federal-State Joint Board, to review the present separations procedures, we cannot allow any changes to be made in existing practices in the meantime which would result in a shift of relative revenue burdens from intrastate services to interstate services. (Footnotes omitted).

*See also In re Hawaiian Tel. Co.*, 87 F.C.C.2d 864, 872 (1981):

The compromise encompassed by the Ozark Plan was result oriented. It was intended to provide a specific level of support by the interstate jurisdiction for local service. To achieve an agreement on an appropriate overall level of compensation, the Ozark Plan embodied a complex series of compromises including the heavy weighting of interstate 'message' service usage in apportioning exchange plant costs. SPF shifts to the interstate jurisdiction over three times the local carrier's costs of providing exchange service than would occur on a strictly relative use basis. On the other hand, some minutes associated with interstate services, such as . . . CCSA, FX, . . . continued to be counted as local, rather than interstate minutes, thereby offsetting, to some extent the heavy weighting of MTS and WATS minutes.

because of complaints that under existing procedures certain allocation factors (*see* note 25 *supra*) are resulting in excessive allocations to the *interstate* jurisdiction. *In re Amendment of Part 67*, 78 F.C.C.2d 837, 840 (1980).[27] *See also In re Amendment of Part 67 of the Commission's Rules and Establishment of a Joint Board*, 89 F.C.C.2d 1, 3–4 (1982).

In the present case, the Commission's allocation of FX plant costs to the interstate jurisdiction, contrary to the FCC's practice, disregards the balancing arrangements under which the FCC–NARUC plan has been administered. Regardless of whether the Commission is bound by federal action in allocating NET's interstate FX minutes of use, it should defer to the practice currently followed by the FCC in carrying out the understandings embodied in the *Separations Manual*. Considering the importance of uniformity in the federal and state regulation of telecommunications, the desirability of according comity to FCC practice in this matter, and fairness in the treatment of NET, we believe that the Commission acted unreasonably in allocating the costs in question to the interstate jurisdiction.

 2. *Administrative Adjustments.* Although the *Separations Manual* specifies which factors are to be used in making separations determinations, it does not describe the precise method of measuring those factors. The mechanics of making such measurements are considered an administrative matter determined by the telephone carriers themselves. *In re New England Tel. & Tel. Co.*, 42 P.U.R.4th 182, 220 (Me.P.U.C.1981). In this case, NET's parent company, AT&T, had presented to NARUC for consideration several administrative adjustments affecting the measurement of separations factors. Those proposed adjustments concerned calendar-day-usage studies, current composite-station ratios (CSR), Ozark-formula SPF calcula-

tions, and simplification of land-and-buildings separations. The Bell operating companies, such as NET, delayed implementation of those proposed administrative adjustments, however, pending the approval of several related substantive changes by the Federal-State Communications Joint Board in the *Separations Manual*.

Noting that NET had recently implemented other administrative changes in the separations process, the Commission imputed to NET the revenue impact of the four contemplated but as yet unimplemented administrative adjustments. The Commission agreed with the staff that NET should not be permitted to employ selectively improvements in cost-measurement techniques.

On appeal NET claims that no other state commission has ever unilaterally ordered an operating telephone company to make any of the four proposed administrative adjustments. It argues that the proposed administrative adjustment in the interstate-intrastate apportionment of costs for land and buildings requires a change in the *Separations Manual* and thus cannot be carried out without FCC approval. NET further argues that for the Commission unilaterally to order NET to implement the four proposed adjustments before the Federal-State Communications Joint Board completes its separations study contravenes the important goal of uniformity in the implementation of separations procedures. NET contends that because of the complexity of the separations process any action on these administrative adjustments should be deferred until the Joint Board, which is currently considering the effect of these and other proposed changes, completes its study. *See In re Amendment of Part 67*, 78 F.C. C.2d 837 (1980); *In re Reservation Telephone Cooperative*, No. E–81–5 (F.C.C. July 17, 1981).

**27.** The FCC has initiated a rulemaking proceeding to amend the *Separations Manual* pursuant to 47 U.S.C. § 410(c), inviting interested parties to submit recommendations on the proper allocation of exchange plant investment between interstate and intrastate services. On the rec-

ommendation of the Federal-State Communications Joint Board, the FCC will probably amend current separations procedures to reflect more accurately the true costs associated with the use of telephone plant. However, such a change has not yet occurred.

It was unreasonable for the Commission, in this case, to attribute to NET the revenue impact of the four proposed administrative adjustments. The Commission admits that determining which cost-measurement methods to use is primarily an administrative decision for NET to make. The four proposed adjustments have not yet been implemented by NET and are currently the subject of study and debate by NARUC and the Joint Board. In the circumstances, the Commission should not have imputed to NET the revenue impact of the four proposed changes.

As we noted in discussing the Commission's allocation of interstate FX minutes of use to the interstate jurisdiction, the Commission should be chary of acting unilaterally in the separations field. Appropriate resolution of the separations problem is a polycentric task involving many interdependent variables. In this field the treatment in isolation of particular types of administrative measurements of costs may be unsound. It is uncertain at present what effect proposed substantive changes in the *Separations Manual* may have on the administrative adjustments that NET is considering. Recently, for example, the FCC, accepting a recommendation of the Joint Board, ordered an interim SPF ("subscriber plant factor") freeze at 1981 levels in order to limit the magnifying effect, in determining interstate allocations, of the SPF formula on interstate subscriber-line usage.[28] *In re Amendment of Part 67 of the Commission's Rules and Establishment of a Joint Board*, 89 F.C.C.2d 1, 3 (1982). Also, the FCC has recognized the importance of having the informed, collective, expert opinion of the Joint Board on calendar-day usage, the subject of one of the four adjustments in this case. *In re Reservation Telephone Cooperative, supra.* It was unreasonable for the Commission to impute to NET the revenue impact of the four inchoate administrative adjustments described above, in view of the fact that they are under study by the Joint Board as part of a systematic reexamination of separations by the FCC and NARUC.

**28.** *See* note 26 *supra.*

### B. *Full Normalization.*

NET challenges the Commission's acceptance of the staff's position that under comprehensive inter-period allocation principles, the taxes paid by NET on amounts credited to a deferred tax reserve should themselves be deferred. The ostensible purpose of this so-called "full" normalization adjustment is to prevent current ratepayers from being charged for taxes due on additional revenues raised by NET to generate the reserve for deferred taxes.

The concept of normalization was described in the *1978 NET Case* as follows:

> Normalization occurs when a utility uses an accelerated depreciation method for income tax purposes, but calculates its tax expense for ratemaking purposes as if it had taken straightline depreciation. Thus, in the early years of an asset's life, the utility collects more from its ratepayers than it actually pays in taxes. This excess amount is then usually credited to a reserve account for deferred taxes.

390 A.2d at 18 n. 4. Under the normalization method of accounting utilized by NET, ratepayers are charged as if NET were taking straightline rather than accelerated depreciation. The revenues that result from this difference constitute taxable income to NET. Current ratepayers are assessed for taxes which are due because of the company's use of accelerated depreciation and yet must pay, as a current expense, the tax due on the revenues raised to generate the reserve for deferred taxes.

The Commission's so-called "full" normalization adjustment seeks to associate the benefits to future ratepayers, resulting from the existence of the deferred-tax reserve, with the costs of accumulating that reserve by requiring that the taxes paid on the amounts credited to deferred taxes themselves be deferred in determining the company's test-year income and expenses. Adopting an adjustment proposed by staff witness John W. Wilson, an economist, the Commission's proposal would charge the in-

come tax expense associated with the accumulation of revenue in the deferred tax reserve as an expense to the future ratepayer who is benefited by the existence of that reserve.[29] This deferred charge has been denominated an "allowance for taxes on deferred credits" (AFTDC). Use of this formula in the present rate case would result in a revenue reduction of $4,058,000, with an AFTDC of $1,897,000. Because current ratepayers benefit to some degree from the deferred tax reserve's exclusion from rate base, the Commission would also include AFTDC in rate base thereby reimbursing NET for the carrying charges it incurs on that figure.

NET claims that the Commission's full normalization adjustment is really not normalization accounting but a "partial flow-through" of monies in NET's deferred tax reserve to current earnings.[30] As such, NET argues that "full" normalization does not comply with I.R.C. § 167(*l*), and therefore jeopardizes its ability to take accelerated depreciation. The Commission denies that "full" normalization results in a partial flow-through and doubts that it violates I.R.C. § 167(*l*). But because of the possibility that "full" normalization *may* run afoul of section 167(*l*), the Commission decided not to implement its proposal at this time and will defer action until the next rate hearing. In the interim, however, the Commission advised NET to seek a revenue ruling from the Internal Revenue Service on whether use of "full" normalization would jeopardize its ability to take accelerated depreciation.

Because it has deferred finally ruling on the propriety of implementing its "full" normalization adjustment until the next NET rate hearing, the Commission argues that the ripeness doctrine should preclude review at this time. The doctrine of ripeness is intended to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). Whenever ripeness is at issue, the inquiry of the Court should focus on "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515. *See also Maine Water Co. v. Public Util. Comm'n*, Me., 388 A.2d 493, 498–99 (1978).

On whether a particular issue is fit for judicial decision, two cases decided since *Abbott Laboratories* are instructive. In *Maine Water Co. v. Public Util. Comm'n, supra*, we declined to review the contention of the water company for lack of ripeness. The Commission had allowed the company all its expenses associated with prosecuting its rate case but announced that expenses associated with superfluous relitigation would not be allowed in the future. On appeal the company contended that such a

29. The operation of this adjustment is illustrated by the following simplified example contained in the Commission's order:

Assuming a 46 percent tax rate, $185 of revenue is required to accumulate $100 in the deferred tax reserve and to pay taxes on that accumulation. If those revenues are decreased by $85, which represents the amount attributable to taxes while allowing a $100 accumulation in the deferred tax reserve, $39 of that decrease [$85 × 0.46] would reflect the resulting income tax reduction to the company and $46 [$85 × (1.0 − 0.46)] would represent the taxes *on the $100* accumulated in the reserve. Dr. Wilson's adjustment would treat the $46 as a deferred charge includable as income on the company's bal-

ance sheet while offsetting that amount by treating it as a liability for current purposes. *In re New England Tel. & Tel. Co.*, 42 P.U.R.4th 182, 209 (Me.P.U.C.1981).

30. As we stated in the *1978 NET Case*, 390 A.2d at 19 n. 6:

Flow-through is a ratemaking technique by which rates are based upon the *actual* taxes to be paid in that year by a utility taking accelerated depreciation. The tax "savings" are credited to income, thereby reducing the utility's revenue requirement. In theory, this results in lower rates during the early years of an asset's useful life, but in higher rates after the cross-over point has been reached.

prospective ruling was erroneous under 35 M.R.S.A. § 303. This Court found the Commission's prospective ruling to be a policy statement of what it intended to do in the future. Because that policy statement was still tentative and under meaningful refinement, did not raise a purely legal issue and imposed no undue hardship on the parties, the Court held that the ruling was not yet ripe for review. *Id.* at 499.

In contrast, in *Lewiston, Greene & Monmouth Tel. Co. v. New England Tel. & Tel. Co.,* Me., 299 A.2d 895 (1973), the Court found that the Commission's order revealed "an avowed commitment by the Commission to effectuate its own plan in accordance with controlling principles, formulas and computations meticulously prescribed in the Order." *Id.* at 908. The Commission had ordered NET to undertake traffic measurements and cost studies and computations for the purpose of developing data for an announced plan of the Commission. Since the order imposed an immediate financial burden on NET and concretely established the rights and obligations of NET, the Court held that the Commission's ruling was ripe for judicial review.

■ As these cases illustrate, an important factor in determining ripeness is whether the particular ruling at issue is a tentative policy statement of future intent or expresses concretely the rights and obligations of the parties. In the present case, the Commission's ruling with respect to "full" normalization has not yet been ordered into effect. In fact, it may never be implemented if the Internal Revenue Service rules that such normalization accounting will jeopardize NET's ability to take accelerated depreciation. As such, the Commission's ruling is closely analogous to its ruling in *Maine Water Co.* It is a tentative expression of future intent, not yet concretely affecting NET.

It is true that the Commission has expressed its opinion that "full" normalization accounting will not jeopardize NET's ability

to use accelerated depreciation under section 167(*l*). But, as the Commission acknowledges, it is not the final arbiter of the propriety of accounting methods under federal tax laws. That the IRS has superior qualifications for deciding on the effect of "full" normalization under section 167(*l*) is beyond question. The Commission acted reasonably in cautiously refusing to implement its "full" normalization adjustment until NET has had an opportunity to seek an IRS ruling.

Under *Abbott Laboratories,* the extent of hardship on the affected party is a further consideration in deciding whether lack of ripeness should preclude resolution of an issue. NET will not suffer any heavy financial burden as a result of the Commission's refusal to rule on this issue. Nor will our refusal to review the Commission's decision place any undue burden on NET. There is no merit in NET's argument that we should review the Commission's expression of opinion on "full" normalization at this time so that NET will not be forced to recover, by the normal review process, losses incurred as a result of some hypothetical invalid Commission order. It is a matter of speculation what the future adverse financial consequences, if any, would be to NET if the Commission should later implement its "full" normalization adjustment and we should thereafter reverse that decision. The only concrete burden NET has been asked to bear at this time is that of seeking a revenue ruling from the IRS.

■ Accordingly, it would be premature now for this Court to render an opinion on the reasonableness of the Commission's expression of opinion. A decision by the IRS may have the effect of settling this issue before the next rate increase is filed by NET. Therefore, because the Commission's decision has not yet been "formalized and its effects felt in a concrete way by the challenging part[y]," we decline to address NET's contention.[31] *Abbott Laboratories,* 387 U.S. at 148–49, 87 S.Ct. at 1515.

---

**31.** Our decision not to exercise our review power in this case should not be construed as

foreclosing the possibility of our review in every utility case where the Commission defers

## C. "Synchronization" of NET and AT&T Interest.

An important component of NET's operating expenses chargeable to ratepayers is its income tax expense. In calculating taxable income, NET deducts its interest payments from gross income. On the theory of compensating fully for the effect of the parent-subsidiary relationship of AT&T and NET, the Commission adopted an interest-allocation adjustment which it has denoted "interest synchronization." To accomplish that adjustment, the Commission calculated the income tax interest deduction corresponding to the amount and cost rate of NET capital structure debt. (See pt. III(A) of this opinion). Next, a portion of AT&T's interest deduction was allocated to NET, since a portion of NET's equity is financed by AT&T debt on which interest is paid.[32] The Commission's application of this adjustment to the present case resulted in an additional $2,091,000 of deductible interest attributable to NET over its claimed $8,537,000 interest expense. As a result, the Commission reduced NET's income tax expense by $1,040,000, thereby reducing the revenue requirement by $2,225,000.

NET apparently does not contest the basic theory behind the Commission's interest-synchronization adjustment, a theory this Court recognized and upheld in the *1978 NET Case*, 390 A.2d at 30. Instead, NET challenges the Commission's application of the adjustment in two specific respects: first, that the Commission's inclusion in rate base of plant financed through "job development investment tax credit" (JDITC) when calculating NET's interest deduction for income tax purposes results in overstating that interest expense and there-

by renders NET ineligible for the tax credit because of I.R.C. § 46(f); second, that the Commission failed to consider pertinent differences between Maine and federal income tax law in applying interest synchronization to the state income tax.

1. *The Commission's Treatment of JDITC.* In 1971, Congress enacted provisions for an investment tax credit.[33] I.R.C. §§ 38, 46. One purpose of the credit is to stimulate investment in new plant and equipment by providing as a credit against tax liability a statutory percentage of the investment in qualifying property during the tax year.[34]

In determining the allowable deduction for interest expense, the Commission multiplied rate base by the combined weighted costs of debt to NET and AT&T. In effect, by doing so, the Commission treated the tax-credit funds, which were obtained interest-free, as if they had been partially obtained from debt instruments in the same proportion as debt is present in the doubly leveraged capital structure of NET. That is so because of the presence of JDITC-financed plant in NET's rate base.

NET asserts that the Commission's methodology results in a violation of I.R.C. § 46(f) that will render NET unable to take the investment tax credit. Since JDITC plant has no associated interest cost, NET claims that the Commission violated I.R.C. § 46(f)(2)(A) & (B), set forth in text below, by failing to recognize that NET's rate base includes interest-free JDITC-financed plant.[35] This failure, NET argues, will cause it to lose its eligibility for JDITC. The Commission contends that inclusion of JDITC-financed plant in rate base is per-

---

finally ruling on an issue until the petitioner's next rate request.

**32.** This adjustment for interest expense basically tracks the double-leverage adjustment used in determining the appropriate rate of return.

**33.** Revenue Act of 1971, Pub.L. No. 92–178, 85 Stat. 497. Earlier provisions for a somewhat similar credit had been repealed by the Tax Reform Act of 1969, Pub.L. No. 91–172, 83 Stat. 487.

**34.** *See* H.R.Rep.No.533, 92d Cong., 1st Sess., *reprinted in* [1971] U.S.Code Cong. & Ad.News 1825, 1838–42; S.Rep.No.437, 92d Cong., 1st Sess., *reprinted in* [1971] U.S.Code Cong. & Ad.News 1918, 1942–48.

**35.** The arguments of both NET and the Commission proceed on the assumption that NET elected the option afforded by subdivision 2 of I.R.C. § 46(f), which brings into play the provisions here in question.

missible under I.R.C. § 46(f)(2) and that such treatment is consistent with the language and legislative history of section 46 and with the applicable treasury regulations. Accordingly, it argues that NET's eligibility for investment tax credit is unaffected.

In enacting section 46 of the Internal Revenue Code, Congress placed certain limitations on the use of JDITC when that credit is amortized, as here, over the life of the associated investment. *See* Treas.Reg. § 1.46–6(a)(3) (1979).[36] Section 46(f) of the Code was designed to prevent regulatory agencies from defeating the credit's intended purpose—stimulation of investment—by "flowing through" to ratepayers the entire savings which result from the credit. *See* H.R.Rep.No.533, 92d Cong., 1st Sess., *reprinted in* [1971] U.S.Code Cong. & Ad. News 1825, 1839; S.Rep.No.437, 92d Cong., 1st Sess., *reprinted in* [1971] U.S.Code Cong. & Ad.News 1918, 1943. Section 46(f)(2) thus specifically provides that no credit shall be allowed in two circumstances:

(A) *Cost of service reduction.*—If the taxpayer's cost of service for ratemaking purposes or in its regulated books of account is reduced by more than a ratable portion of the credit allowable by section 38 (determined without regard to this subsection), or

(B) *Rate base reduction.*—If the base to which the taxpayer's rate of return for ratemaking purposes is applied is reduced by reason of any portion of the credit allowable by section 38 (determined without regard to this subsection).

Hence, subdivisions 2(A) and 2(B) permit a limited "flow through" to consumers of the benefits accrued through use of the credit.[37] As long as cost of service is not "reduced by more than a ratable portion of the credit" and as long as rate base is not reduced by any of the credit, the utility remains eligible for the credit. *See Public Service Co. of New Mexico v. Federal Energy Regulatory Commission,* 653 F.2d 681, 684–85 (D.C.Cir. 1981).

As explained above, the Commission's methodology for calculating the interest expense treats the entire rate base, which includes JDITC, as though it were financed conventionally in the same proportions as the capital structure. NET contends that such treatment runs afoul of the proscription in subsection 46(f)(2)(B) that rate base not be reduced by reason of the credit. In support of its argument, NET relies on certain language in the Senate and House Reports which accompanied the Revenue Act of 1971 and in Treas.Reg. § 1.46–6(b)(3)(ii) (1979), one of the regulations implementing section 46(f). The Senate Report states in pertinent part:

**36.** Treas.Reg. § 1.46–6(a)(3) provides, in pertinent part, as follows:

(3) *General rules.* The provisions of section 46(f)(1) and (2) are limitations on the treatment of the credit for ratemaking purposes and for purposes of the taxpayer's regulated books of account only. . . . If an election is made under section 46(f)(2), the credit may be flowed through to income (but not more rapidly than ratably) and there may not be any reduction in rate base. . . .

**37.** In *Public Service Co. of New Mexico v. Federal Energy Regulatory Commission,* 653 F.2d 681, 685 n. 5 (D.C.Cir.1981), the United States Court of Appeals for the District of Columbia explained the various ways in which the consumer or the investor may receive the benefits of the credit:

There are at least two ways that consumers may receive the benefits of the credit. One, the credit may be used to pay part of the cost of service. This is typically done by using the credit to reduce the income tax liability taken into account in determining

rates. Since consumers pay the cost of service, if the credit is used solely to reduce cost of service, the benefits of the credit inure solely to consumers. Two, the credit may be used to pay part of the cost of the property producing the credit, with a reduction made in the amount of capital deemed to be allocated to public use and a corresponding reduction made in the rate base. Since consumers pay a return based on the rate base, if the credit is used solely to reduce the rate base, the benefits of the credit again inure solely to consumers. In order for the benefits of the credit to inure solely to investors, the credit must be used to pay part of the cost of the investment property, but with no reduction made in either the cost of service or the rate base. Since consumers then would pay the same cost of service and return on capital as if the credit was not present, investors would earn a higher effective rate of return.

In determining whether or to what extent a credit has been used to reduce the rate base, reference is to be made to any accounting treatment that can affect the company's permitted profit on investment by treating the credit in any way other than as though it had been contributed by the company's common shareholders. For example, if the 'cost of capital' rate assigned to the credit is less than that assigned to common shareholders' investment, that would be treated as, in effect, a rate base adjustment.

S.Rep.No.437, 92d Cong., 1st Sess., *reprinted in* [1971] U.S.Code Cong. & Ad.News 1918, 1946.[38] Section 1.46–6(b)(3)(ii) (1979) of the treasury regulations explains in different terms what is meant by a rate base reduction:

In determining whether, or to what extent, a credit has been used to reduce rate base, reference shall be made to any accounting treatment that affects rate base. In addition, in those cases in which the rate of return is based on the taxpayer's cost of capital, reference shall be made to any accounting treatment that affects the permitted return on investment by treating the credit in any way other than as though it were capital supplied by common shareholders *to which a 'cost of capital' rate is assigned that is not less than the taxpayer's overall cost of capital rate (determined without regard to the credit).* What is the overall cost of capital rate depends upon the practice of the regulatory body. Thus, for example, an overall cost of capital rate may be a rate determined on the basis of an average, or weighted average, of the costs of capital provided by common shareholders, preferred shareholders and creditors. (Emphasis added.)

The Senate Report (as well as somewhat similar language in the House Report) can be read as suggesting that all JDITC must be treated as if it were attributable to common equity. However, the emphasized provision of the treasury regulation quoted above merely requires that the cost-of-capital rate assigned to JDITC be not less than the utility's overall cost-of-capital rate determined without regard to the credit. According to the regulation, the overall cost of capital may be determined on the basis of a weighted average of the various costs of capital supplied by shareholders and creditors, implying that JDITC may be properly treated as though it were ordinary capital consisting of both common equity and leveraged investment or debt.

After recognizing the apparent inconsistency between the treasury regulations and the quoted passages in the legislative reports, the Courts of Appeals for the Eighth Circuit and the District of Columbia have held that treating JDITC as if it were ordinary capital did not operate as a prohibited rate base adjustment under I.R.C. § 46(f)(2)(B). *Union Electric Co. v. Federal Energy Regulatory Commission,* 668 F.2d 389 (8th Cir. 1981); *NEPCO Municipal Rate Committee v. Federal Energy Regulatory Commission,* 668 F.2d 1327 (D.C.Cir.1981); *Public Service Co. of New Mexico v. Federal Regulatory Commission,* 653 F.2d 681, 687 (D.C.Cir.1981). We agree. Independent review of the legislative history and of IRS regulations interpreting section 46(f)(2) convinces us that the cited federal decisions are correct.

The legislative history of the Revenue Act of 1971 shows that Congress intended that both investors and consumers of regulated utilities should share the benefits of the tax credit. The House Report states:

In restoring the investment credit for public utility property of regulated companies, the committee has given careful consideration to the impact of this credit on ratemaking decisions. Although there are many different ways of treating the credit for ratemaking purposes, your

---

**38.** There is a parallel statement in the House Report, H.R.Rep.No.533, 92d Cong., 1st Sess., *reprinted in* [1971] U.S.Code Cong. & Ad.News 1825, 1841. However, the last sentence in the House Report version says:

For example, any lesser 'cost of capital' assigned to the credit would be treated as, in effect, a rate base adjustment.

committee, in general, believes that it is appropriate to divide the benefits of the credit between the customers of the regulated industries and the investors in the regulated industries.

H.R.Rep.No.533, 92d Cong., 1st Sess. 24, *reprinted in* [1971] U.S.Code Cong. & Ad. News 1825, 1839. To the same effect is S.Rep.No.437, 92d Cong., 1st Sess. 36, *reprinted in* [1971] U.S.Code Cong. & Ad. News 1918, 1945.

To hold that Congress intended that JDITC be treated exclusively as if it were common equity supplied by shareholders would be inconsistent with one of the dominant themes of the legislative history, namely, that the benefits of the tax credit be shared by both investors and consumers. Under the Commission's interest-synchronization method, both the shareholders and the ratepayers benefit from the credit. The utility gets interest-free capital and the ratepayers receive lower rates as a result of the interest deduction and concomitant lower cost of service.[39] The Commission's position is that if JDITC were treated as if it were common equity, the revenue requirement of NET would be thereby artificially inflated and the ratepayers would derive no benefit from the JDITC.

NET challenges the Commission's assumption that, in the absence of JDITC, the capital otherwise supplied by the credit would be replaced by a balanced combination of equity and debt. Implicit in NET's argument is the assumption that if JDITC did not exist it would be replaced entirely by equity capital supplied by common shareholders. When confronted with a case involving similar divergent assumptions regarding capital acquisition, the Court of Appeals for the District of Columbia decided as follows:

As a matter of economic theory, the competing theories advanced by FERC [the Federal Energy Regulatory Commission] and [the utility] raise questions that

are undoubtedly complex. The question before this court, however, is not. The function of this court is not to speculate on the manner in which a utility would finance investment in a world devoid of the investment tax credit. Since no issue of statutory interpretation is presented, the question before this court is simply whether the factual assumption relied on by the Commission in applying the statute is arbitrary, capricious, or an abuse of discretion. We hold that it is not.

The assumption of capital acquisition relied on by FERC is supported by reasonable economic theory. Textbook economics suggests that an enterprise is likely to establish a target capital structure, and make individual financing decisions that are consistent with the maintenance of that target. *See* E. Brigham, Financial Management Theory and Practice 512 (2d ed. 1979). If this is true, then, in the absence of ADITC, additional capital needed to finance the investment property would be generated from all capital suppliers, in approximately the same proportion as previously existing in the capital structure. Since existing proportions of debt and equity in all likelihood reflect an established target capital structure, it is reasonable to assume that, in order to maintain that target, the ADITC portion of the rate base would be financed with similar proportions of debt and equity.

653 F.2d at 689–90 (footnote omitted).

The Commission's assumption that, in the absence of JDITC, NET would finance its plant by ordinary means with a combination of equity and debt in the same proportion as it exists in the capital structure is reasonable. The Commission's treatment of JDITC in this case is not inconsistent, therefore, with the intended purpose of section 46(f).

That the treasury regulations are intended to permit JDITC to be treated like ordi-

---

**39.** In the words of the Court of Appeals for the Eighth Circuit in *Union Electric Co.*, 668 F.2d 389, at 394:

The higher the interest, the greater the tax deduction, the lower the income tax obliga-

tion, the lower the cost of service, the lower the rates. Therefore, both the utility and the ratepayers benefit from the credit; the utility receives cost-free capital and the ratepayers pay lower rates.

nary capital in the determination of the interest expense tax deduction is clear from the following prefatory comments accompanying the 1979 amendments to Treas.Reg. § 1.46–6:

Section 1.46–6 (originally proposed as § 1.46–5) implements section 46(f). That provision lists the circumstances for disallowing an investment tax credit. Public comments suggested that the definition of 'rate base reduction' contained in § 1.46–6(b)(3) of the proposed regulations was inconsistent with the legislative history of section 46(f). The Committee reports accompanying section 105 of the Revenue Act of 1971 indicated that investment tax credits must be treated as capital contributed by the common shareholders of regulated companies and must be assigned the same cost of capital rate as all other capital provided by common shareholders. The proposed regulations merely required that a credit be assigned a cost of capital rate not less than the company's overall rate of return. The committee reports also state that the limitations of section 46(f) were intended to achieve two goals: a sharing of benefits between consumers and investors and a limitation on Federal revenue losses. Under certain circumstances, the common shareholder equity rule would deny consumers any of the benefits of a credit and could force ratemaking authorities to set rates higher than the rates that would have been established had no credit been available. Under such circumstances, Federal revenue losses would not be merely limited to the amount of the credit, but would be reduced to an amount less than the credit. Congress did not intend to force consumers to subsidize the cost of the investment tax credit.

T.D. 7602, approved Mar. 15, 1979, 44 Fed. Reg. 17666, 17666–67 (March 23, 1979).

■ Treasury regulations that "implement the congressional mandate in some reasonable manner" are entitled to considerable deference, since "Congress has delegated to the Secretary of the Treasury, not to this Court, the task 'of administering the tax laws of the Nation.'" *Commission-*

*er v. Portland Cement Co.*, 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981) (quoting from *United States v. Correll*, 389 U.S. 299, 307, 88 S.Ct. 445, 449, 19 L.Ed.2d 537 (1967) and *United States v. Cartwright*, 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973)). The treasury's explanation and interpretation of section 46(f) afford a reasonable basis for the provisions of section 1.46–6(b)(3)(ii) of its regulations, and those provisions must therefore be deemed controlling. The Commission's treatment of JDITC in this case does not result in a prohibited rate base reduction under I.R.C. § 46(f)(2)(B).

NET contends that the Commission's treatment of JDITC also violates I.R.C. § 46(f)(2)(A) (set forth in text above) by impermissibly reducing cost of service by more than a ratable portion of the credit. The treasury regulations define "cost of service" as the amount required by a utility to provide goods and services, including expenses of operation and maintenance, depreciation, taxes and interest. Treas.Reg. § 1.46–6(b)(2)(i) (1979). NET claims that cost of service is reduced because the Commission, in effect, imputes an interest expense to interest-free JDITC. As in its argument with respect to section 46(f)(2)(B), discussed above, NET assumes implicitly that, in the absence of JDITC, the capital otherwise supplied by the tax credit would be contributed exclusively by common shareholders. Any other treatment, NET argues, will result in a more-than-ratable reduction in cost of service in violation of section 46(f)(2)(A).

The Commission assumes that cost of service would remain exactly the same if JDITC did not exist on the ground that NET would finance its plant by ordinary means, including a combination of debt and equity in the same proportion as in the capital structure. Under the Commission's theory, no change in the percentage of debt would occur, and therefore no change would occur in the tax liability used to compute cost of service. Accordingly, the Commission reasons that cost of service remains unaffected by the inclusion of JDITC in the

determination of NET's interest deduction in computing its federal income tax obligation. The difference between the positions stems ultimately from the contrary assumptions of the parties regarding capital acquisition in the absence of JDITC.

On appeal, our function as a reviewing court is limited to determining whether the Commission's method is reasonable and supported by evidence. As we held above with respect to section 46(f)(2)(B), the Commission's assumption of balanced capital acquisition in the absence of the tax credit is not arbitrary, capricious or an abuse of discretion. Under the Commission's theory, ratepayers bear the same cost of service, excluding the ratable reduction permitted by the statute, as they would pay in the absence of JDITC. *See Public Service Co. of New Mexico*, 653 F.2d at 691–92. Accordingly, we affirm the Commission's conclusion that its treatment of JDITC did not impermissibly reduce cost of service in violation of I.R.C. § 46(f)(2)(A). The Court of Appeals for the District of Columbia reached the same result in *NEPCO Municipal Rate Committee*, 668 F.2d 1327, at 1338.

In sum, we hold that the Commission's treatment of JDITC does not violate the provisions of either subsection A or subsection B of I.R.C. § 46(f)(2). The Commission's treatment of JDITC in its interest-synchronization adjustment is reasonable and results in a sharing of the benefits of the credit by both investors and ratepayers; it does not impermissibly overstate the interest expense deduction in a way that would deprive NET of a right to investment tax credit.

■ 2. *Effect of "Interest Synchronization" Adjustment on Maine State Income Taxes.* On appeal, NET contends that because the Commission multiplied the weighted cost of AT&T debt in NET's capital structure by rate base in computing the interest allocation[40] it treats some AT&T interest, in effect, as deductible for purposes of the State of Maine income tax. Arguing that it is not so deductible under 36 M.R.S.A. §§ 5102(8) & 5211(8) (1978 & Supp.1981–1982), NET urges the Court to remand on this issue. In its brief, the Commission admits that its calculations failed to consider adequately the differences in federal and state income tax laws; in effect, it does not contest NET's argument. Consequently, the case must be remanded to the Commission for reconsideration of this issue.

D. *Antitrust Suit Expense.*

Under its license contract with AT&T, NET is charged with a share of the cost of defending the antitrust suit by the Department of Justice (DOJ) against AT&T, Western Electric and Bell Telephone Laboratories, the named defendants in that action. NET included the $197,250 expense in its test-year cost of service. The Commission disallowed the expense, reasoning that defense of the suit primarily benefited shareholders, not ratepayers, and that NET had failed to prove any specific justification for the expense as required by an earlier order. *See New England Tel. & Tel. Co., Re: Proposed Increase in Rates*, F.C. # 2213 (Me. P.U.C. June 10, 1977). In its 1977 order, the Commission allowed as a ratemaking expense NET's $2,000 share of the cost of defending the DOJ suit, but stated that in future rate cases the expense would not "automatically be allowed without specific justification."

NET contends that the Commission erred in requiring it to justify specifically the reasonableness of the DOJ suit expense. NET further contends that the decision whether to allow the DOJ suit expense should not hinge on its ability to show that the defense of the suit primarily benefits ratepayers. According to NET, there exists a "presumption of management prudence" requiring the Commission to allow all actual expenses "unless it clearly appears that they are excessive or unwarranted or incurred in bad faith," citing *Central Maine Power Co. v. Public Util. Comm'n*, 153 Me. 228, 244, 136 A.2d 726, 736 (1957). NET asserts that the DOJ suit expense should have been allowed because it is a prudent

---

**40.** See pt. III(A) of this opinion.

**310** ▆▆▆▆▆▆▆▆▆▆▆▆

expense, unavoidable under the circumstances and beneficial to both shareholders and ratepayers. The Commission defends its position by arguing that NET failed to satisfy the burden of proof imposed by 35 M.R.S.A. §§ 69 & 307 (1978 & Supp.1981–1982) and by the prior Commission order.

▆▆▆▆▆ Under sections 69 and 307, NET must demonstrate the justness and reasonableness of the DOJ suit expenses for ratemaking purposes. *See Casco Bay Lines v. Public Util. Comm'n*, Me., 390 A.2d 483, 493 (1978). NET presented two witnesses who testified about the costs of the DOJ antitrust suit; however, neither witness gave testimony compelling the conclusion that it was just and reasonable to charge Maine ratepayers with those costs. From the lack of evidence in the record the Commission could rationally decide that NET had not satisfied its burden of proof, and this Court has no basis for disturbing that decision on appeal.[41] *See Central Maine Power Co. v. Public Util. Comm'n*, Me., 433 A.2d 331, 341 (1981). The Commission did not treat its 1977 order as imposing a higher standard of proof than sections 69 and 307 already require. In effect, the order merely placed NET on notice that thereafter it would be required to establish specifically the justness and reasonableness of the DOJ-defense expense, and nothing in the record indicates that the Commission treated its earlier order as creating a higher standard of proof than the statute provides.

E. *BIS Expenses.*

NET included $413,065 in test-year expenses for the development of centralized data processing services known as Business Information Systems (BIS). Under its license contract with AT&T, New England Telephone and other Bell operating companies share in the cost of research and development of new systems. The Commission disallowed NET's $99,433 share of the cost

of four of the many BIS projects; namely, those known by the acronyms "BISCUS," "BOSS," "COPS," and "DIR/ECT."

Years ago, when the Commission approved the BIS cost-sharing agreement in a 1967 order, it stated that it "reserves the right to investigate and pass upon the reasonableness of all charges relating to such contract.…" *In re Proposed Agreement Between Bell Telephone Laboratories, New England Tel. & Tel. Co. and Operating Companies*, F. No. 13,523 (Me. P.U.C. July 1, 1967). Making reference to that reservation and to a similar one made in a 1977 order approving BIS expenses, the Commission found, after investigation, that the four BIS projects designated above could not be reasonably charged to Maine ratepayers and disallowed them. The Commission reasoned that none of the four projects is currently in service in Maine and that, although conceivably some of the expenses associated with the four projects could be amortized and charged to Maine ratepayers, NET had failed to prove the justness of such treatment.

NET claims it provided sufficient evidence of the reasonableness of the BIS costs and that the Commission's decision is therefore wrong. NET's witness, John Hann, testified to the effect that all BIS projects are for research and development and are beneficial to Maine ratepayers, that the four in question have not yet been implemented in Maine, and that future improvements in NET service gained as a result of BIS research will benefit Maine ratepayers as well as other Bell System customers. NET asserts that this is sufficient evidence of the reasonableness of all costs of BIS projects, including the four in question, especially since the propriety of BIS research and development is a management decision.

---

41. Certain other state utility commissions have also denied DOJ antitrust suit expenses as a cost of service. *E.g., In re Mountain States Tel. & Tel. Co.*, 39 P.U.R.4th 222, 242–43 (Colo. Pub. Util. Comm'n 1980); *In re Northwestern Bell Tel. Co.*, 37 P.U.R.4th 1, 27 (Minn. Pub. Serv. Comm'n 1980); *In re Chesapeake & Potomac* *Tel. Co. of Md.*, 70 Md.P.S.C. 341, C. No. 7305 (Md. Pub. Serv. Comm'n Nov. 13, 1979); *Ex parte South Central Bell Tel. Co.*, 24 P.U.R.4th 477, 483 (La. Pub. Serv. Comm'n 1978). *Contra Washington Util. & Transp. Comm'n v. Pacific Northwest Bell Tel. Co.*, 39 P.U.R.4th 126, 145 (1980) (allowing DOJ suit expense).

■ The determination whether a particular expense is reasonable or just for purposes of ratemaking is often difficult. The Commission must weigh the evidence and use its expertise in evaluating that evidence. Because the Commission has been delegated the primary task of determining whether a utility has met its burden of proof and justified a particular expense, this Court reviews that decision only for abuse of discretion. If the decision is reasonable and the findings are supported by substantial evidence, this Court does not interfere with the result. *See 1978 NET Case*, 390 A.2d at 59–60. Moreover, the Commission may accept or reject all or part of the testimony of any witness. Here, the Commission could have rationally believed that Hann's testimony fell short of proving that the four BIS projects in question benefit Maine ratepayers now or will benefit them in the reasonably near future.

■ Scrutiny of the record in this case does not reveal anything that would justify this Court in overturning the Commission's conclusion that NET did not satisfy its burden of proving that the justness and reasonableness of NET's rates required the expenses of the four BIS projects in question to be included.

## VI. ATTRITION ALLOWANCE

Attrition is the erosion in the rate of return on rate base resulting from an expectation that net operating expenses or net investment in plant, or both, will increase more rapidly than revenues. If attrition occurs and no allowance has been made for it, the realized rate of return may fall below the rate of return authorized by the Commission. Attrition is thought to be the result of steadily increasing construction costs and of applying a rate of return determined on the basis of experience from a past test year to operations that are going to take place in the future. *See Central Maine Power Co. v. Public Util. Comm'n*, Me., 382 A.2d 302, 316 n. 18 (1978). In the instant case, NET, through its expert, McBrierty, presented an attrition study seeking an allowance of about $14,000,000

for attrition during the years that the new rates are effective. Although the staff did not present an attrition study in rebuttal, the Commission rejected entirely NET's proposed attrition allowance on the ground that NET had failed to meet its burden of proof.

NET witness McBrierty testified that NET's earnings over a 12-month period ending in March, 1982 would remain relatively constant and that a decline in rate of return would occur because of growth in investment. In reaching that conclusion, McBrierty projected figures for future earnings, expenses, investment and rate base to determine the amount of attrition. He reviewed various historical periods and discovered "certain trends" in the relatively flat earning capacity of NET. Extrapolating from those trends, he projected relatively constant future earnings for NET—a conclusion he deemed supported by the history of NET's actual earning capacity. Accordingly, McBrierty concluded that when flat earnings were coupled with the $50,-000,000 in projected investment growth, which he derived from construction expenditures actually budgeted for Maine, the result would be a decrease in the intrastate rate of return from 8.31% to 6.98% by March, 1982.

Finding McBrierty's attrition study "both incomplete and inconsistent," the Commission rejected NET's request for an attrition adjustment of $14,000,000. According to the Commission, the trends pointed to by McBrierty were in fact not discernible and the methods he employed lacked theoretical or factual support. The Commission also found that although all his forecast figures had to be combined to arrive at a final projection of earnings, the various components were projected on the basis of different historical periods. On the grounds of the subjectivity of certain of his crucial assumptions and lack of unifying technique, the Commission rejected McBrierty's finding that NET's earnings would remain flat in the future. The Commission believed that his investment-growth component—more specifically, the construction budget—

had been derived without adequate consideration of potential revenue increases and cost savings resulting from growth and modernization of plant. For those reasons, among others, the Commission rejected NET's attrition study.

The staff did not present its own attrition study. A staff witness, John Wilson, gave as his opinion that "productivity gains can be expected to sufficiently offset increased capital and other costs in the future so that a further attrition allowance is not required." The Commission apparently believed that the testimony of Wilson, who analyzed and criticized the NET attrition study, supported its rejection of NET's fourteen-million-dollar attrition allowance. The Commission thought also that NET's failure to use certain more accurate statistical techniques for predicting attrition supported its conclusion that NET had failed to meet its burden of proof.

On review, the Commission's attrition decision must be upheld if the result is reasonable and if it is supported by substantial evidence. *1978 NET Case*, 390 A.2d at 49. The utility has the burden of proving that attrition will occur and of quantifying any adjustments that should be made to reflect such attrition. *Central Maine Power Co.*, 382 A.2d at 316–18. That attrition has occurred in the past does not imply that it will necessarily occur in the future. *Id.*

The issue before the Commission was one of burden of proof: whether NET presented sufficient evidence to support an attrition allowance. Because the staff presented no rebuttal study, the Commission was substantially limited to the evidence presented by McBrierty and criticized by Wilson. When the staff chooses not to present a rebuttal case, the Commission is not bound *ipso facto* to accept the testimony of the utility. Rather, the Commission is free to weigh the evidence, judge the credibility of that evidence, and draw its own independent conclusions, provided they are sufficiently warranted by the evi-

dence.[42] See *Maine Water Co. v. Public Util. Comm'n*, Me., 388 A.2d 493, 496 (1978).

The Commission reviewed McBrierty's testimony and exhibits and found them unpersuasive. In its order, the Commission set forth what it found to be the shortcomings of McBrierty's attrition study and the Commission's reasons for rejecting his conclusions. Considering the Commission's expertise in utility ratemaking and our traditional deference to that expertise, we must uphold the Commission's rejection of NET's proposed attrition figure.

In its order, the Commission did not state explicitly that NET's rate of return would not be affected to any extent by attrition. By statute, the Commission has the duty of assuring that proposed rate schedules, to the greatest extent possible, are just and reasonable. 35 M.R.S.A. § 69; *New England Tel. & Tel. Co. v. Public Util. Comm'n*, Me., 376 A.2d 448, 454 (1977). Although the Commission may accept or reject particular expenses or adjustments proposed by the utility, it has a responsibility to ensure as far as possible that the utility receives a fair and reasonable return on its investment. *1978 NET Case*, 390 A.2d at 31, 35. That responsibility includes determining the amount of attrition in a case where some attrition is proved though not in the amount claimed by the utility. *See, e.g., New England Tel. & Tel. Co. v. Department of Public Util.*, 371 Mass. 67, 354 N.E.2d 860 (1976); *New England Tel. & Tel. Co. v. State*, 113 N.H. 92, 302 A.2d 814 (1973).

This is not a case in which the Commission denied any attrition allowance solely because NET had failed to prove the specific amount requested. If this were a case in which there was evidence supporting the utility's claim that it was entitled to some allowance for attrition and the Commission had found only that the utility had failed to prove its right to an attrition allowance in the specific amount requested, we would

---

**42.** Though the Commission may not ignore evidence before it, neither may the utility place the burden upon the Commission to demonstrate the inadequacy of a suggested methodology. *1978 NET Case*, 390 A.2d at 49.

remand for a determination whether some lesser attrition allowance should be made on the basis of evidence in the record. *See New England Tel. & Tel. Co. v. Department of Public Util.*, 371 Mass. at 74, 354 N.E.2d at 865. *Cf. Central Maine Power Co. v. Public Util. Comm'n*, Me., 382 A.2d 302 (1978) (express finding by the Commission that no attrition had been shown).

However, in the instant case, the Commission's order includes the following recital:

> Had consistent time periods and statistical methods been employed and had the company conducted a more complete analysis of the revenue and cost-saving implications of the construction budget, upon which the entire attrition request is based, then somewhat different conclusions might have been reached. What these results would have been we do not know, but in the absence of adequate evidence that future attrition has been demonstrated, we do not find that the company has met its burden with respect to this issue.

*In re New England Tel. & Tel. Co.*, 42 P.U.R.4th 182, 231 (Me.P.U.C.1981). That recital amounts to a finding by the Commission that there is no basis in the evidence for deciding that NET is entitled to any attrition allowance. To judge from the language of the order, the Commission apparently believes that there may possibly be some attrition in NET's rate of return but cannot find any basis in the evidence for determining that it exists or, if it does, its amount. This Court is in no position to make a finding to the contrary: namely, to hold that the facts in evidence include all the data necessary for arriving at a just and reasonable allowance for attrition. NET has the burden of showing its entitlement to some attrition allowance, and we are bound by the Commission's finding, which is not irrational on the evidence of record, that NET has not established its entitlement to an attrition allowance in any amount.

■ NET asks us to remand the case for consideration of further evidence of attri-

tion, which it contends has in fact become manifest since the close of the record. Such a remand would be improper. Absent highly unusual circumstances, not present in this case, consideration by the Commission of evidence offered after the close of the hearing would further prolong the process of public utility ratemaking by subverting the finality of Commission orders based on evidence in the record.

## VII. RATE DESIGN

■ Rate design refers to the determination of the appropriate charges for different classes of customers and services that will generate the required revenue level. *1978 NET Case*, 390 A.2d at 58. Under 35 M.R.S.A. § 64 (Supp.1981–1982), the utility makes the initial decisions on rate design, but its decisions are not final and need not be accepted by the Commission. Section 294 of Title 35 authorizes the Commission, in its discretion, to substitute reasonable rate schedules upon a finding that the schedules proposed by a public utility are unjust, unreasonable, insufficient, unjustly discriminatory, or otherwise in violation of the law. *1978 NET Case*, 390 A.2d at 59. The Commission may properly reject a utility's proposed rate design if rejection of the method on which it is based is reasonable and supported by substantial evidence on the record. *Central Maine Power Co. v. Public Util. Comm'n*, 416 A.2d 1240, 1247–49 (1980).

In this case, NET proposed an entirely new method for determining the proper rate design. In an attempt to align the prices for each of various types of service more closely with the cost of providing service of that type, NET performed a kind of cost-based price analysis known as "embedded direct analysis" (EDA) on the basis of which NET analyzed the various costs and revenues for each category of service it provided. The Commission rejected NET's application of EDA and the resulting rate-design proposals on the ground that it was "convinced by the record . . . that the EDA contains substantial flaws which render it unreliable as a basis for allocating the reve-

nue requirement among the classes of services." Instead, because there were a number of significant categories for which rate increases were proper but for which there were, in the Commission's view, no valid studies to govern the precise allocation of the revenue increase, the Commission applied what it called a "uniform percentage increase." [43] Because the rate-suspension period was nearly over, the Commission did not undertake to develop a new rate design on its own initiative.

The crux of NET's argument is that the Commission failed to give meaningful consideration to its major rate-design proposals. According to NET's brief on appeal, that inference is clear from the "Commission's wholesale adoption, with minor editing, of the Examiners' Report, which suggested a uniform percentage increase only as a temporary measure pending further rate design investigation, with only such superficial editing as was needed to change the result to a total rejection of NET's major rate design proposals." In Part I of this opinion, we addressed NET's general contention that the normal standard of appellate review should not be applied in this case because the Commission did not give appropriate independent attention to the examiners' report.[44] We rejected that general contention, and the reasons we gave in Part I for rejecting it are applicable to NET's specific complaint about the Commission's decisions on rate design.[45]

█ NET asserts also that there was insufficient evidence in the record to support the Commission's rejection of NET's major proposals based on embedded direct analysis and that the Commission's findings describe inadequately the reasons for the rejection. The use of EDA in this case was criticized by both a staff witness, Allen G. Buckalew, and intervenor Casco Bank's witness, Dr. Lee L. Selwyn. They testified to several flaws in the analysis, including incongruities in the treatment of categories of service. The testimony of Messrs. Buckalew and Selwyn provided evidentiary support for the Commission's rejection of the rate design arrived at by NET's application of EDA. In its order, the Commission expresses adequately its reasons for rejecting EDA in this case, and we have no basis for finding that the Commission's rejection of NET's proposed rate design was unjust or unreasonable.

█ In the circumstances, the Commission's imposition of a schedule of rates, including its so-called "uniform percentage

---

**43.** The Commission explained its methodology as follows:

> To the extent that any of the proposed rates for particular services are founded upon the EDA and have no other reliable basis for support, we are compelled to find them unjust and unreasonable.
>
> For all classes of service so affected and under review in this proceeding, where record evidence supporting an alternative basis for revising the existing rate structure is absent, we believe it is only reasonable and fair to require that such classes of service be given the same percentage increase over test-year revenues generated by that class of service. Such an approach has been utilized in similar circumstances by this commission and found to be reasonable. *Central Maine Power Co. v. Maine Pub. Utilities Commission* (Me.Sup.Jud.Ct.1980) 416 A.2d 1240.
>
> We recognize that our express determination with regard to certain rates for specific services as set forth below will affect the amount of the company's overall revenue deficiency. It is our intention that after taking such express determinations into account the

residual company overall revenue deficiency shall be applied uniformly to the various classes of service. This approach to the residual revenue requirement shall hereinafter be referred to as a 'uniform percentage increase.' (Footnote omitted.)

*In re New England Tel. & Tel. Co.*, 42 P.U.R.4th 182, 233–34 (1981).

**44.** See item numbered (1) in Part I, *supra*, p. 279.

**45.** Although the Commission's order tracks closely the examiners' report, we note that on one important question—whether a separate investigation should be initiated into NET's rate design—the Commission declined to follow the recommendation of the hearing examiners and denied the motion of staff and intervenors to initiate such an investigation. *Compare In re New England Tel. & Tel. Co.*, 42 P.U.R.4th 182, 248–49 (Me.P.U.C.1981), *with* Examiners' Report, Me. Public Util. Comm'n., New England Tel. & Tel. Co., Re: Proposed Increase in Rates, Docket No. 80–142, 96–97 (Mar. 16, 1981).

increase," upon the existing rate structure was not unjust or unreasonable. The Commission has an affirmative statutory obligation to determine whether "proposed" rates are just and reasonable and, if not, to "fix" just and reasonable substitute rates. *Central Maine Power Co. v. Public Util. Comm'n*, Me., 382 A.2d 302, 323–24 (1978). As a concomitant duty, the Commission must implement those rates in a rate structure as a facet of ratemaking. *Id. Accord Central Maine Power Co. v. Public Util. Comm'n*, Me., 416 A.2d 1240, 1250 (1980). In the absence of an acceptable alternative rate-design proposal, the rate design imposed by the Commission was a reasonable means of performing its ratemaking function.

No other issues require the attention of this Court.

The entry is:

(1) The decision of the Commission is set aside in those parts relating to the following issues:

(a) classification of foreign exchange (FX) minutes of use (Part V(A)(1) of this opinion);

(b) implementation of administrative adjustments (Part V(A)(2) of this opinion); and

(c) the effect of the "interest-synchronization" adjustment on Maine state income taxes (Part V(C)(2) of this opinion).

(2) On those issues, the case is remanded to the Commission for further proceedings in accordance with the opinion herein.

(3) In all other respects the decision of the Commission is affirmed.

All concurring.